UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Case No. |
| SOUTHRIDGE CAPITAL MANAGEMENT LLC, ) SOUTHRIDGE ADVISORS LLC and ) STEPHEN M. HICKS, ) ) | JURY TRIAL DEMANDED |
| Defendants. ) ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following

against defendants Southridge Capital Management LLC ("Southridge Capital"), Southridge

Advisors LLC ("Southridge Advisors"), and Stephen M. Hicks ("Hicks"):

## PRELIMINARY STATEMENT

1.      This enforcement action concerns two unregistered hedge fund advisers

(Southridge Capital and Southridge Advisors) and their principal (Hicks) who defrauded

investors in their hedge funds in three different ways.  First, they raised millions of dollars from

investors between 2004 and 2007 by promising that at least 75% of their money would be

invested in unrestricted, free-trading shares.  Defendants failed to keep that promise, and they

placed the investors' money in so many relatively illiquid securities that by year-end 2007,

investors had submitted nearly $7 million in redemption requests which defendants were unable

to satisfy.  Second, defendants significantly overvalued the hedge funds' largest single investment, allowing them to pay or accrue for themselves more than $1.8 million in undeserved management fees.  Third, defendants caused two of the hedge funds to pay approximately $5 million of legal and administrative expenses incurred by three other hedge funds, and when the misappropriation came to light, they repaid the two funds with illiquid securities, not cash.

2.    Through the activities alleged in this Complaint, defendants engaged in:  (a) fraud in the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"); (b) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and (c) fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 thereunder.

3.    Accordingly, the Commission seeks:  (a) the entry of a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (b) disgorgement of the defendants' ill-gotten gains, plus pre-judgment interest; and (c) the imposition of civil penalties due to the egregious nature of the defendants' violations.

## JURISDICTION

4.    The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)].  The Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities

Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

5.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-9(e), 80b-14]. Venue is proper in this District because, at all relevant times, Southridge Capital and Southridge Advisors maintained an office here and Hicks maintained a residence here.

6.     In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

7.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

8.     **Southridge Capital** is a Delaware limited liability company with offices in Ridgefield, Connecticut, and New York City. At all relevant times, it was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)]. Hicks founded Southridge Capital in 1996 to manage various hedge funds. As of 2003, Southridge Capital was the manager for the following five hedge funds (hereafter referred to as "the Southridge Funds" or "the Funds"): Sovereign Partners, L.P. ("Sovereign Partners"), Dominion Capital Fund Ltd. ("Dominion Capital"), Dominion Investment Fund LLC

3

("Dominion Investment"), Southridge Partners L.P. ("Southridge Partners"), and Southshore

Capital Fund Ltd. ("Southshore Capital").  Sovereign Partners and Southridge Partners are

domestic funds for U.S. investors, while Dominion Capital, Dominion Investment, and

Southshore Capital are offshore funds primarily for non-U.S. investors.

      9.     **Southridge Advisors** is a Delaware limited liability company with offices in

Ridgefield, Connecticut, and New York City.  At all relevant times, it was an "investment

adviser" within the meaning of Section 202(a)(11) of the Advisers Act.  Hicks founded

Southridge Advisors in 2008 to replace Southridge Capital as manager for Southridge Partners

and Southshore Capital.

      10.    **Hicks**, age 52, lives in Ridgefield, Connecticut.  Through various intermediary

entities, Hicks and his wife own a controlling interest in Southridge Capital and Southridge

Advisors (collectively, "Southridge").  At all relevant times, Hicks was an "investment adviser"

within the meaning of Section 202(a)(11) of the Advisers Act due to his ownership and control of

Southridge and his conduct in managing the Funds.

## STATEMENT OF FACTS

**Fraudulent Misrepresentations to Investors in**
**Southridge Partners and Southshore Capital**

      11.    Sovereign Partners, Dominion Capital, and Dominion Investment (collectively,

"the Old Funds") primarily engaged in private investments in public equity ("PIPEs") with

micro-cap issuers.  Micro-cap issuers typically have limited assets, and their stocks tend to be

low priced and to trade in small volumes on the "over-the-counter" market.  PIPE deals may take

a variety of forms (such as convertible debentures, convertible preferred stock, or restricted

common stock), but their common feature is that the investor provides cash to the issuer and then, at some later date, has an opportunity to receive a certain amount of the issuer's common stock, usually at a discount from the market price, which the investor may then sell as it sees fit. For many of the PIPE deals involving convertible debentures or convertible preferred stock, the issuer would have to register shares of its common stock before the Old Funds could convert their investment and sell the common stock. Many of these deals also provided that, after a conversion, the Old Funds could not hold 5% or more of the issuer's outstanding common stock.

12.     By 2004, the three Old Funds had little cash available to satisfy investor redemption requests. The principal reason is that the bulk of the Old Funds' assets were invested in convertible debentures or convertible preferred stock from a handful of micro-cap issuers, and the ordinary trading volume for those stocks was too small for a profitable liquidation of the Funds' substantial holdings. As a result, the Old Funds received very little additional money from investors after 2004.

13.     Beginning in late 2003, Hicks began raising millions of dollars for Southridge Partners and Southshore Capital (collectively, "the New Funds") by soliciting investors in the Old Funds as well as new investors.

14.     Hicks told prospective investors in the New Funds that he had learned his lesson from the liquidity problems afflicting the Old Funds, and that 75% of the New Funds' investments would be in unrestricted, free-trading shares, meaning shares that were available to be sold. One investor even obtained a side letter giving him the right to redeem his entire investment if more than 25% of his assets in the New Funds became illiquid. Hicks also told some investors that the New Funds would invest in short-term transactions that would take only

10 or 15 days, such as equity line of credit ("ELC") deals. An ELC is a form of PIPE in which an investor promises to purchase a quantity of the issuer's common stock at set intervals or upon the issuer's request, with the quantity of stock determined by a formula that includes a discount from the market price. Compared to a typical investment in convertible debentures, convertible preferred stock, or restricted common stock, a typical ELC is a short-term investment because the investor takes possession of the common stock when it makes the investment and may then sell the common stock without delay.

15.     Hicks made similar statements on HedgeFund.net, a website that provides information about hedge funds to the investing public. For example, the "due diligence questionnaire" for Southridge Partners posted on that website as of October 17, 2005 stated:

> No one position is significant. Given our long term experience with the global capital markets, we have strategically positioned the fund so that a high degree of liquidity is targeted for investors. Specifically, 75% of the fund's assets are held in unrestricted securities, cash or near cash. We believe this structure substantially lessens the impact of the naturally inherent cyclicality of the stock market.

Southridge sent copies of the October 17, 2005 due diligence questionnaire to investors and prospective investors upon request.

16.     At the outset in 2004 and 2005, Southridge and Hicks did invest the New Funds' assets primarily in ELCs and other short-term PIPE deals. However, that soon began to change. At year-end 2006, more than one-third of Southridge Partners' assets and more than half of Southshore Capital's assets were invested in relatively illiquid PIPE deals (convertible debentures, convertible preferred stock, or restricted common stock) or in other instruments such as promissory notes. The same was true for year-end 2007 and year-end 2008.

6

17.     Nevertheless, Hicks continued to tell investors that more than 75% of the New Funds' assets would be invested in liquid investments, cash, or cash equivalents. For example, HedgeFund.net posted an interview with Hicks dated November 12, 2007 in which he touted his "flagship PIPE strategy" for the New Funds and stated:

> What differentiates us in this arena is that we are, for sure, the most liquid PIPES fund out there today.  For investors in our strategy, liquidity is a concern, and we address this by keeping a majority of the funds (75%) in cash or liquid securities.

Similarly, the "due diligence questionnaire" for Southridge Partners posted on HedgeFund.net as of July 3, 2008 stated:

> We have strategically positioned the fund so that a high degree of liquidity is targeted for investors.  Specifically, we target 75% of the fund's assets to be invested in free trading securities, cash or near cash, and up to 25% is invested in restricted securities.  We believe this structure substantially lessens the impact of the naturally inherent cyclicality of the stock market.

18.     Hicks raised nearly $80 million for the New Funds between 2004 and 2007 (according to the Funds' audited financial statements):

| Year | Southridge Partners | Southshore Capital |
|---|---|---|
| 2004 | $8,569,211 | $931,359 |
| 2005 | $19,592,855 | $11,002,993 |
| 2006 | $9,811,330 | $7,793,232 |
| 2007 | $18,813,439 | $2,399,345 |
| **Total** | **$56,787,360** | **$22,126,929** |

(The Funds' auditors have not yet completed the audits for 2008 and 2009.)

19.     By year-end 2007, investors in the New Funds had submitted nearly $7 million in redemption requests which defendants were unable to satisfy.  The principal reason is that, as had

7

happened with the Old Funds by 2004, the bulk of the New Funds' assets were now invested in relatively illiquid PIPE deals involving convertible debentures or convertible preferred stock from a handful of micro-cap issuers, and the ordinary trading volume for those stocks was too small for a profitable liquidation of the Funds' substantial holdings. Indeed, many of the relatively illiquid deals for the New Funds involved the same handful of micro-cap issuers in whom the Old Funds had invested.

**Fraudulent Mispricing of Significant Assets of the Southridge Funds**

20.     From 2004 through 2007, the Southridge Funds had between $100 million and $125 million in total assets under management. The Funds' assets shrank after the stock market collapse in 2008. As of February 2009, the Southridge Funds had less than $70 million in total assets under management.

21.     Since 2004, the largest single holding of the Southridge Funds has been an aggregate investment of $30 million or more in Fonix Corporation ("Fonix"), a small Utah-based company whose primary business has been the development of speech recognition software.

22.     The $30 million valuation for the Southridge Funds' investment in Fonix derives almost entirely from a February 2004 transaction in which Fonix acquired a 100% interest in two affiliated telecommunications companies, LecStar Telecom, Inc. and LecStar DataNet, Inc. (collectively, "LecStar"), from an entity controlled by Hicks. The genesis of the February 2004 transaction was as follows:

        a.     Between 1997 and 2002, the Southridge Funds invested nearly $20 million in LecStar and its predecessor companies.

8

   b.  In November 2002, Hicks obtained an appraisal of LecStar.  The appraisal concluded that, as of October 1, 2002:  (1) LecStar was insolvent and thus not a going concern; (2) during the first nine months of 2002, LecStar had a net loss of more than $18 million on revenues of approximately $6.5 million; (3) an orderly liquidation of LecStar's tangible assets would yield approximately $127,000; and (4) the fair market value of a 100% interest in LecStar was only $10,000.

   c.  In December 2002, McCormack Avenue, LLC ("McCormack"), one of numerous offshore "special purpose vehicles" that Hicks used to make investments for the Funds and the entity which had acted as a vehicle for the Southridge Funds' investment in LecStar, obtained a 100% interest in LecStar by foreclosing on $769,000 in secured promissory notes for which LecStar was in default.  The foreclosure left LecStar's unsecured creditors and the holders of LecStar's common stock with nothing, confirming that, as of December 2002, the value of a 100% interest in LecStar was less than $769,000, the amount of the secured debt that had been foreclosed.

   d.  Later in December 2002 – after McCormack had taken over LecStar – Southridge and Hicks obtained a second appraisal of LecStar.  This appraisal, which relied on optimistic cash flow projections supplied by Southridge Capital, concluded that a 100% interest in LecStar was worth between $8.27 million and $10.57 million.

   e.  In July 2003, Hicks and the Chief Financial Officer of Fonix began discussing a transaction in which Fonix would purchase LecStar from McCormack.  The Southridge Funds had invested more than $60 million in Fonix since 1998, and Fonix had just entered into another $20 million equity line of credit with the Southridge Funds.  Even so, Fonix

was in serious financial trouble: it had reported a net loss of nearly $20 million in 2002 on revenues of only $3 million, and its accumulated deficit exceeded $194 million at year-end 2002.

      f.      In September 2003, McCormack transferred a 100% interest in LecStar to LTEL Holdings Corp. ("LTEL"), another entity controlled by Hicks, in exchange for LTEL securities with a stated value of $27.5 million. The $27.5 million figure was completely arbitrary, as Hicks controlled the entities on both sides of the transaction. Also, the $27.5 million figure was more than double the high end of the December 2002 appraisal that itself had been based on optimistic projections supplied by Southridge Capital.

      g.      In February 2004, Fonix acquired a 100% interest in LecStar from LTEL. Fonix paid no cash for LecStar. Instead, Fonix tendered securities with a stated value of $33 million: (1) $20 million of non-convertible Series H preferred stock; (2) a $10 million six-year promissory note secured by the stock and assets of LecStar; and (3) common stock to be worth $3 million when issued.

      h.      In March 2004 – after the acquisition by Fonix had been completed – there was a third appraisal of LecStar. This appraisal concluded that a 100% interest in LecStar was worth $34 million – three times the figure from the December 2002 appraisal only fifteen months earlier. This latest appraisal relied heavily on erroneous information indicating that, for the first time ever, LecStar had generated a net profit in the fourth quarter of 2002. The appraisal also relied heavily on the incorrect assumption that the $33 million purchase price for the February 2004 transaction had been negotiated at arm's length, whereas in fact: (1) Hicks (through the Southridge Funds) controlled LTEL, the entity which was selling LecStar, (2) Hicks (through the

Southridge Funds) was the principal source of financing for Fonix; and (3) Hicks and the CFO of Fonix had determined the purchase price.

23.     The Private Offering Memorandum ("POM") and/or Limited Partnership Agreement ("LPA") for each of the Southridge Funds establishes ground-rules for valuing the Funds' investments.  For example:

a.      Section 1.8(b) of the LPA for Sovereign Partners provides that: (1) restricted securities will initially be valued at the actual purchase price and will then be marked to the freely-tradable price on a month-to-month basis; (2) the market value of securities traded on an exchange or national market system will be valued based on the "bid" and "ask" prices; and (3) securities for which no secondary market exists "will be valued in accordance with the valuation provided by [the fund's] clearing broker or an independent pricing service."

b.      The "Net Asset Value" section of the POM for Southridge Partners provides that:  (1) restricted securities issued by public companies that are acquired in private placements pursuant to Section 4(2) of the Securities Act and Regulation D thereunder, and for which there is no readily available aftermarket, will be valued at their acquisition cost unless Southridge Capital decides to assign a higher or lower value due to subsequent developments, market conditions, or other factors; (2) the market value of securities traded on an exchange or national market system will be valued based on recent price quotations; and (3) securities for which no secondary market exists "will be valued in accordance with the valuation provided by [the fund's] clearing broker or an independent pricing service.

24.     The Fonix preferred stock and secured notes which the Funds acquired in exchange for LecStar were not restricted securities, were not issued pursuant to Section 4(2) of

11

the Securities Act and Regulation D, and were not traded on an exchange or national market system. Accordingly, defendants were required to value these Fonix securities in accordance with a valuation provided by a clearing broker or an independent pricing service. Defendants did not comply with this obligation.

25. After selling the Fonix common stock received in the February 2004 transaction, the Southridge Funds valued the remaining Fonix securities which they had received in exchange for LecStar at a "cost" of $30 million – $20 million for the Series H preferred stock and $10 million for the six-year secured promissory note. (By contrast, Fonix in its audited financial statements carried the fair value of its liability for the preferred stock and secured note at $8,624,000.)

26. Even if defendants could properly have valued the Fonix preferred stock and secured note at its acquisition cost, they knew or were reckless in not knowing that the $30 million figure was not a real "acquisition cost" because, as set forth above, (1) Hicks had effectively been on both sides of the February 2004 transaction; (2) the Southridge Funds had not paid cash; and (3) the value of what the Southridge Funds did pay – a 100% interest in LecStar – was worth much less than $30 million. Further, the Fonix preferred stock which the Southridge Funds received in exchange for LecStar was non-convertible and thus had no immediate cash value, and Fonix lacked the resources to pay off the $10 million note in the foreseeable future, due to its dire financial condition (a net loss of $13.5 million in 2003 on revenues of only $2.4 million).

27. In September 2006, the Southridge Funds exchanged the Fonix non-convertible Series H preferred stock for convertible Series L preferred stock with a stated value of

12

$19,608,000. Also in September 2006, the Southridge Funds (through McCormack) declared

that Fonix had defaulted on payments of nearly $1 million due on the secured note, and they

threatened to exercise their rights to seize the collateral (the stock and assets of LecStar).  One

month later, LecStar filed for bankruptcy, and so any increase in the value of Fonix resulting

from the addition of LecStar in February 2004 had clearly ended.

      28.    In November 2008, the Southridge Funds exchanged the principal and interest due

on the $10 million note for Fonix convertible Series P preferred stock with a stated value of

$10,043,725.

      29.    The Southridge Funds have continued to carry the Series H and Series P preferred

stock at the "cost" of nearly $30 million, although Fonix has continued to lose money even

without the bankrupt LecStar, as reflected in the following chart based on Fonix's public filings

with the Commission:

| Year | Tangible Assets | Liabilities | Revenues | Net Loss | Accumulated Deficit |
|------|-----------------|-------------|----------|----------|---------------------|
| 2006 | $174,000 | $35,135,000 | $1,329,000 | $21,943,000 | $291,200,000 |
| 2007 | $211,000 | $38,027,000 | $1,838,000 | $6,059,000[1] | $277,943,000 |
| 2008 | $40,000 | $44,473,000 | $1,265,000 | $6,169,000 | $286,367,000 |

(2008 is the last full year for which information is available, because Fonix is delinquent in its

required filings with the Commission.)

      30.    To date, the Southridge Funds have converted only a small portion of the Series L

preferred stock and none of the Series P preferred stock.  The primary reason is that the price of

---

[1] Fonix reported a profit of $14,959,000 in 2007, but only because it recorded a one-time

Fonix common stock has fallen far below a penny per share and the trading volume in Fonix common stock has been too small for a profitable liquidation of the Funds' substantial holdings. Indeed, Fonix's market capitalization has shrunk drastically since 2005:

| Date | Stock Price per Share | Dollar Amount Traded | Outstanding Shares | Market Capitalization |
|------|----------------------|---------------------|--------------------|-----------------------|
| 12/31/05 | $0.01963 | $117,454 | 383,667,000 | $7,531,383 |
| 12/31/06 | $0.0035 | $29,060 | 1,094,685,000 | $3,831,398 |
| 12/31/07 | $0.00019 | $5,863 | 3,641,961,000 | $691,973 |
| 12/31/08[2] | $0.20 | $7,171 | 3,323,000 | $664,600 |
| 12/31/09 | $0.00313 | $16,168 | 64,815,000 | $202,871 |
| 10/19/10 | $0.0013 | $217 | 64,815,000 | $8,426 |

31.     The $30 million valuation of the Funds' investment in Fonix resulting from the February 2004 transaction enabled Southridge and Hicks to collect hundreds of thousands of dollars in management fees every year since 2004.  The standard management fee was at least 1% of the Funds' net assets.  At that rate, the Funds paid or accrued management fees totaling at least $300,000 per year on the $30 million in Fonix securities, for a total of more than $1.8 million to date.

**Fraudulent Misappropriation of Fund Assets to Pay Legal Expenses**

32.     By 2004, as noted above, the three Old Funds had little cash available to satisfy investor redemption requests because the bulk of their assets had been invested in convertible debentures or convertible preferred stock from a handful of micro-cap issuers, and those

---

gain of $21,018,000 arising from the forgiveness of liabilities associated with LecStar.

positions could not be profitably liquidated. At the same time, the Old Funds were incurring significant legal expenses related to numerous lawsuits filed against Hicks, Southridge Capital, and related parties in connection with investments made by the Old Funds.

33.    Between 2005 and 2008, defendants caused the New Funds to pay approximately $5 million of legal and administrative expenses incurred by the Old Funds. Investors in the New Funds were not told about this misappropriation of Fund assets while it was taking place.

34.    In February 2009, Hicks sent to letter to investors in the Southridge Funds admitting that certain legal and administrative expenses had been improperly allocated between the Funds. Rather than repaying the money to the New Funds, however, Southridge and Hicks simply transferred certain illiquid securities from the Old Funds to the New Funds.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

35.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-34 above.

36.    As set forth above, from 2003 through 2008, defendants raised nearly $80 million for the New Funds (Southridge Partners and Southshore Capital) while telling investors and prospective investors that at least 75% of their funds would be invested in unrestricted, free-trading securities. Defendants knew or were reckless in not knowing that these statements were false and misleading. In fact, by year-end 2006, one-third to one-half of the New Funds' assets were invested in restricted securities such as convertible debentures, convertible preferred stock, or restricted common stock, or in other instruments such as promissory notes, with the result that

---

[2] Fonix effected a 1-for-5,000 reverse stock split on December 26, 2008.

by year-end 2007, investors in the New Funds had submitted nearly $7 million in redemption requests which defendants were unable to satisfy.

37.     Defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

38.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

39.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-38 above.

40.     As set forth above, from 2003 through 2008, defendants raised nearly $80 million for the New Funds (Southridge Partners and Southshore Capital) while telling investors and prospective investors that at least 75% of their funds would be invested in unrestricted, free-trading securities.  Defendants knew or were reckless in not knowing that these statements were false and misleading.  In fact, by year-end 2006, one-third to one-half of the New Funds' assets were invested in restricted securities such as convertible debentures, convertible preferred stock,

16

or restricted common stock, or in other instruments such as promissory notes, with the result that by year-end 2007, investors in the New Funds had submitted nearly $7 million in redemption requests which defendants were unable to satisfy.

41.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

42.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

### THIRD CLAIM FOR RELIEF
### (Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8)

43.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-42 above.

44.     As set forth above, from 2003 through 2008, defendants raised nearly $80 million for the New Funds (Southridge Partners and Southshore Capital) while telling investors and prospective investors that at least 75% of their funds would be invested in unrestricted, free-trading securities.  Defendants knew or were reckless in not knowing that these statements were false and misleading.  In fact, by year-end 2006, one-third to one-half of the New Funds' assets

were invested in restricted securities such as convertible debentures, convertible preferred stock, or restricted common stock, or in other instruments such as promissory notes, with the result that by year-end 2007, investors in the New Funds had submitted nearly $7 million in redemption requests which defendants were unable to satisfy.

45.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. §§80b-6(4)] and Rule 206(4)-8 [17 C.F.R. §275.206(4)-8] (which became effective in October 2007).

### FOURTH CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

46.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-45 above.

47.     As set forth above, defendants have valued the Fonix securities received in the February 2004 transaction at the "cost" of $30 million. Defendants knew or were reckless in not knowing that the $30 million figure was not a real "cost", because (1) Hicks had effectively been on both sides of the February 2004 transaction; (2) the Southridge Funds had not paid cash; and (3) the value of what the Southridge Funds did pay – a 100% interest in LecStar – was worth much less than $30 million. Further, the Fonix preferred stock was non-convertible and thus had no immediate cash value, and Fonix could not pay off the $10 million note in the foreseeable future, given its dire financial condition. Nevertheless, defendants charged the Southridge Funds a 1% management fee per year ($300,000) based on this improper valuation of the Fonix securities.

18

48.     Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

49.     As a result, defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§80b-6(1), (2)].

### FOURTH CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

50.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-49 above.

51.     As set forth above, defendants secretly caused the two New Funds (Southridge Partners and Southshore Capital) to pay approximately $5 million of legal and administrative expenses incurred by the three Old Funds (Sovereign Partners, Dominion Capital, and Dominion Investment), and they later caused the Old Funds to repay the New Funds with overvalued, illiquid securities rather than cash.  Defendants knew or were reckless in not knowing that using the New Funds' assets to pay the Old Funds' expenses and then failing to repay the New Funds in full was a breach of their fiduciary duty to the New Funds.

52.     Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly:  (a) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are

engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

53.     As a result, defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§80b-6(1), (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining defendants, and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1.     Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

2.     Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and

3.     Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

B.     Require defendants to disgorge their ill-gotten gains, plus pre-judgment interest;

C.     Order defendants to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

D.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

_Kevin M. Kelcourse_

Martin F. Healey  (Mass. Bar No. 227550)
    Regional Trial Counsel
Frank C. Huntington  (Mass. Bar No. 544045)
    Senior Trial Counsel
Kevin M. Kelcourse  (Mass. Bar No. 643163)
    (Connecticut Federal Bar No. phv0063)
    Assistant Director
Lawrence W. Pisto  (Mass. Bar No. 555317)
    Senior Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8960  (Huntington direct)
(617) 573-4590  (fax)
huntingtonf@sec.gov  (Huntington email)

<u>Local Counsel</u>:
John B. Hughes          _John B Hughes_
Connecticut Federal Bar No.: ct05289
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT  06510
(203) 821-3700
(203) 773-5373 (Facsimile)

Dated:  October 25, 2010

21