UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
HARTFORD

_____
                                        )
SECURITIES AND EXCHANGE COMMISSION,     )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          Case No. 3:10-cv-1685-RNC
                                        )
SOUTHRIDGE CAPITAL MANAGEMENT LLC,      )          March 18, 2013
SOUTHRIDGE ADVISORS LLC, and            )
STEPHEN M. HICKS,                       )
                                        )
          Defendants.                   )
_____)


**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**


Marc Jones (phv05721)
          Senior Enforcement Counsel
Michael D. Foster (phv04800)
          Senior Trial Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8947 (Jones direct)
(617) 573-4590 (fax)
jonesmarc@sec.gov

Local Counsel:
John B. Hughes (Fed. Bar No. CT-05289)
 Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373 (fax)

**CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................. 1

SUMMARY OF UNDISPUTED FACTS ............................................................................ 2

    I.   The Defendants and their Hedge Funds ................................................................ 2

    II.  The New Funds Launched Because the Old Funds Had Liquidity Problems ................. 3

    III. The New Funds Paid Legal and Administrative Expenses of the Old Funds ................. 3

    IV. Hicks Controlled the Expense Payment Process and Knowingly Caused the New
          Funds to Pay Legal Expenses of the Old Funds ................................................... 4

    V.  Southridge's Accounting Controls Were Inadequate ........................................... 5

    VI. By 2007, Southridge's Key Personnel Were Aware Legal Expenses Were Not
          Being Booked to the Funds and the Funds' Books Did Not Balance ........................... 6

    VII. In 2008, Southridge "Repaid" the New Funds with Illiquid Securities ........................... 7

    VIII. The Undisputed Facts Do Not Support the Defendants' Attempt to Portray the
          Misappropriation from the New Funds as a Mere Bookkeeping Error ........................... 7

ARGUMENT ..................................................................................................................... 8

    I.   The Summary Judgment Standard ....................................................................... 8

    II.  Sections 206(1) and 206(2) of the Advisers Act ............................................... 9

    III. The Defendants' Misappropriation of the New Funds' Cash to Pay the Old
          Funds' Expenses Violated Sections 206(1) and 206(2) of the Advisers Act ................. 10

        A.   The Defendants' Conduct and the Resulting Harm is Undisputed ........................ 10

        B.   The Defendants Acted with Scienter .................................................................. 11

             1. The Defendants Acted Knowingly and Intentionally ........................................... 12

             2. At a Minimum, the Defendants Acted Recklessly ............................................. 15

         C.   The Defendants Were Investment Advisers and Used Interstate Commerce ......... 17

APPROPRIATE RELIEF .................................................................................................. 18

    I.   The Court Should Enter a Permanent Injunction against Future Violations of the
          Advisers Act .................................................................................................... 19

II.   The Court Should Hold a Hearing on Disgorgement and Civil Penalties ...................... 20

CONCLUSION ............................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 445 U.S. 680, 691-93, 697 (1980)......................................................... 9

*Abrahamson v. Fleschner,* 568 F.2d 862, 870 (2d Cir. 1977) ..................................... 18

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ......................................... 8

*Burks v. Lasker,* 441 U.S. 471, 482 n. 10 (1979)......................................................... 10

*Celotex Corp*. v. *Catrett*, 477 U.S. 317 (1986) ............................................................. 8

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase,* 553 F.3d 187, 198
   (2d Cir. 2009)............................................................................................................... 11

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976)..................................... 11

*Goldstein v. SEC*, 451 F.3d 873, 876 (D.C. Cir. 2006)................................................. 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986) ..................... 8

*Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000)...................................................... 12

*Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472 n. 11 (1977)....................... 10, 15

*SEC  v. Credit Bancorp, Ltd*., 738 F. Supp. 2d 376, 392 (S.D.N.Y. 2010) ................ 9, 19

*SEC v. Berger*, 244 F. Supp. 2d 180, 192-93 (S.D.N.Y. 2001) .................................... 18

*SEC v. Brown*, 579 F. Supp. 2d 1228, 1236 (D. Minn. 2008) ...................................... 17

*SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) ................................................... 19

*SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.3d 90, 99-100 (2d Cir. 1978).......... 19

*SEC v. Dimensional Entm't Corp.,* 493 F. Supp. 1270, 1274 (S.D.N.Y.1980)............. 9

*SEC v. First Jersey Sec*., 101 F.3d 1450, 1467 (2d Cir. 1996) ....................... 11, 19, 20

*SEC v. Haligiannis,* 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007).................................. 18

*SEC v. Juno Mother Earth Asset Mgmt., LLC,* 2012 WL 685302, at *6 (S.D.N.Y. Mar. 2, 2012)
   ..................................................................................................................................... 18

*SEC v. KPMG LLP*.  412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) ................................ 11

*SEC v. Lyttle*, 538 F.3d 601, 602–05 (7th Cir.2008) ................................................... 17

*SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998)....................................................... 15

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 811-13 (2d Cir. 1975).......................... 13

*SEC v. Moran*, 922 F. Supp. 867, 896 (S.D.N.Y. 1996)........................................ 10, 17

*SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 411 (S.D.N.Y. 2012)..................... 16

*SEC v. Research Automation Corp.,* 585 F.2d 31, 33–35 (2d Cir. 1978)....................... 9

*SEC v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006)....................................... 9

*SEC v. Universal Exp., Inc.¸*475 F. Supp. 2d 412, 423-24 (S.D.N.Y. 2007)............... 13

*SEC v. Wall Street Publishing Inst., Inc.*, 591 F. Supp. 1070, 1084 (D.D.C. 1984)..................... 11

*Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979)............................................................. 9, 11

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001) ......... 13

*Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17 (1979) ........................... 10, 15

*U.S. v. Onsa*, 2013 WL 789182, at * 4 (E.D.N.Y. Mar. 1, 2013)................................................ 18

*Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) ...................................... 12

*Van Cook v. SEC,* 653 F.3d 130, 138 (2d Cir. 2011).................................................................. 11

## Statutes

15 U.S.C. § 80b-2(11)....................................................................................................................... 9

15 U.S.C. § 80b-6 ....................................................................................................................... 1, 9

15 U.S.C. § 80b-9 ..................................................................................................................... 19, 20

## Rules

Fed. R. Civ. P. 30(b)(6)................................................................................................................... 3

Fed. R. Civ. P. 56 ........................................................................................................................... 8

Local Rule. 56(a)(2&3).................................................................................................................... 8

## Regulations

17 C.F.R. §201.1004 ...................................................................................................................... 20

## INTRODUCTION

Defendants Southridge Capital Management LLC, Southridge Advisors LLC and Stephen Hicks engaged in a series of fraudulent schemes while managing a group of five hedge funds. The Commission seeks summary judgment as to the scheme identified in Count V of the Complaint.[1]  Count V alleges that the Defendants violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("the Advisers Act") [15 U.S.C. § 80b-6(1), (2)] by fraudulently causing their two new hedge funds ("the New Funds") to pay legal expenses incurred by their three older hedge funds ("the Old Funds") in litigation to which they themselves were parties, and then by purporting to compensate the New Funds with illiquid securities rather than cash.

The Commission's motion is based on admissions by the Defendants in their written discovery responses, deposition testimony, and disclosures and sworn testimony in the Commission's pre-suit investigation.  Those admissions show that the Defendants do not and cannot dispute that:  (1) Hicks knowingly caused the New Funds to pay $5.5 million of legal fees and other expenses of the Old Funds; (2) the improper payments occurred from 2004 until 2008; and (3) the securities transferred to the New Funds in late 2008 as "compensation" for the improper payments were so illiquid that even today, more than four years later, the New Funds have been unable to sell half of those securities.

Because these facts are undisputed, the Commission is entitled to summary judgment on Count V.  Accordingly, the Commission respectfully requests that the Court:  (1) enter judgment for the Commission on Count V; (2) enter a permanent injunction against future violations of

---

[1] Count V was inadvertently labeled in the Complaint as a second "Count IV".  Count V appears on page 19 of the Complaint and begins at Paragraph 50.

Sections 206(1) and 206(2) of the Advisers Act; and (3) hold a hearing to determine the appropriate amount of disgorgement (with prejudgment interest) and civil penalties.

## SUMMARY OF UNDISPUTED FACTS

### I.     The Defendants and their Hedge Funds

Southridge Capital Management ("Southridge Capital") and Southridge Advisors are Delaware limited liability companies with offices in Ridgefield, Connecticut and in New York City.  Plaintiff's Local Rule 56(a)(1) Statement of Facts ("Facts"), ¶¶1, 4.  Each describes itself as an investment management firm organized to provide global asset management services, principally in securities investments.  Facts ¶¶ 2, 5.

Prior to 2008, Southridge Capital was the investment adviser for five different hedge funds ("the Funds"):  (1) Sovereign Partners, L.P. ("Sovereign"), Dominion Capital Fund Ltd. ("Dominion Capital"), and Dominion Investment Fund LLC ("Dominion Investment") (collectively, "the Old Funds"); and (2) Southridge Partners, L.P. ("Southridge Partners") and Southshore Capital Fund Ltd. ("Southshore") (collectively, "the New Funds").  Facts ¶¶ 8, 10. In August 2008, Southridge Advisors took over as the investment adviser for the New Funds. Facts ¶ 11.  Southridge Capital continued as the investment adviser for the Old Funds.  Facts ¶ 12.

Stephen Hicks is the founder and CEO of both Southridge Capital and Southridge Advisors.  Facts ¶ 13.  The same group of people, including Hicks, conducted the activities of the two Southridge entities.  Facts ¶ 6.

On the investment side, Hicks had primary responsibility over investment selection, deal structuring, portfolio monitoring, and investment liquidation for the Funds.  Facts ¶ 15.

On the administrative side, Hicks controlled the process for paying the expenses of the two Southridge entities and the Funds.  *See, e.g.,* Facts ¶¶ 48, 67.  He was the sole person who

could authorize the payment of expenses and direct what cash should be used to pay them.  Facts ¶¶ 48-53, 56-62.

Thomas Saunders has served as the CFO of Southridge Capital and Southridge Advisors since July 2006.  Facts ¶ 17.  Pursuant to Fed. R. Civ. P. 30(b)(6), Saunders was designated by the two Southridge entities as their corporate representative on several deposition topics, including the payment of legal and administrative expenses.  Facts ¶ 19.

## II.     The New Funds Launched Because the Old Funds Had Liquidity Problems

The Old Funds primarily engaged in "private investments in public equity" (or "PIPES").  Facts ¶ 26.  Starting in approximately 2000, the Old Funds became involved in a series of lawsuits relating to their PIPE investments.  Facts ¶ 27.  These protracted lawsuits, in which Southridge and Hicks were defendants, had a significant impact on the ability of the Old Funds to generate liquidity for their investors and to meet the increasing number of redemption requests from investors in the Old Funds.  Facts ¶¶ 28, 29.  As Hicks stated during investigative testimony in 2009, "the cost of the litigation has just been outrageous."  PX-11, at 149.

Because of these legal issues, the Old Funds were closed to new investors.  Facts ¶ 30.  In approximately 2003, Hicks and the Southridge entities began to solicit investors and raise money for the New Funds.  Facts ¶ 31.  Hicks claimed that the New Funds would follow a different investment strategy in light of his adverse experience with the Old Funds and their associated litigation.  Facts ¶ 32.

## III.    The New Funds Paid Legal and Administrative Expenses of the Old Funds

Each of the Funds had its own separate bank accounts.  Facts ¶ 54.  Each of the Funds was responsible for its own legal fees and administrative expenses.  Facts ¶ 33.  Legal expenses were paid out of a separate bank account specifically designated as the "legal reserve."  Facts ¶

51.  Each of the Funds was supposed to contribute cash to the legal reserve in proportion to its respective share of any legal expenses due to be paid.  Facts ¶ 55.

Nevertheless, between 2004 and 2008, the New Funds paid over $5.5 million of the Old Funds' expenses.  Facts ¶ 38.  Most of that amount ($5,424,468) was taken from Southridge Partners to pay for expenses owed by Sovereign and Dominion Capital. Facts ¶ 39.  The figure of $5.4 million paid between 2004 and 2008 represented approximately 12% of the total amount invested in Southridge Partners.  Facts ¶ 40.   Additionally, the Dominion Investment fund paid approximately $328,000 of expenses attributable to the other Old Funds (Sovereign Partners and Dominion Capital).  Facts ¶ 37.

## IV.   Hicks Controlled the Expense Payment Process and Knowingly Caused the New Funds to Pay Legal Expenses of the Old Funds

Legal bills for the Funds went first to Hicks for his review.  Facts ¶ 47.  Hicks decided which legal expenses were attributable to which of the Funds, and he was responsible for telling the accounts payable clerk how to allocate the legal expenses among the Funds, which he usually did by writing the allocation on the bill itself.  Facts ¶¶ 49, 56-58.  Sometimes it was "obvious from the bill" which funds were involved in the lawsuit for which services had been rendered. PX-5 at 23:15-19.  Hicks was the sole person to authorize the writing of checks to pay those bills.  Facts ¶¶ 51-53.

When the legal reserve account needed more cash, Hicks told the accounts payable clerk to move money into that account from one of the Funds' accounts.  Facts ¶ 60.  Hicks alone directed which of the Funds would pay to replenish the legal reserve.  Facts ¶¶ 61-62.  The accounts payable clerk did not have authority to make such transfers without Hicks' approval. Facts ¶ 61.  As CFO Saunders testified, "Steve [Hicks] would tell that accounts payable clerk to move X dollars to the [legal reserve] account to pay bill X."  Facts ¶ 62.

Every week, Hicks would receive a report showing what cash was available in each of the Funds' bank accounts, broken out by fund. Facts ¶ 66. Hicks dealt with all cash flow issues related to covering expenses month to month, and he needed to monitor the cash levels to perform both his investment and administrative responsibilities. Facts ¶¶ 64, 65. In deciding to pay a particular legal bill, Hicks knew or could readily determine how much money was in the legal reserve account and also which fund or funds had cash available to pay for a given expense. Facts ¶¶ 64-67. Thus, it was none other than Hicks who directed that the New Funds pay legal expenses attributable to the Old Funds.

## V.     Southridge's Accounting Controls Were Inadequate

Defendants admit that Southridge had "inadequate accounting procedures for tracking expenses paid by the general partner/investment manager on behalf of the managed funds" and insufficient controls to ensure that expenses were being properly recorded on its books and allocated properly among the managed funds. Facts ¶¶ 77, 96. Southridge personnel routinely failed to charge legal and administrative expenses back to the individual Funds. Facts ¶¶ 78-82. The Old Funds were not made to contribute cash to the legal reserve and fund operating accounts consistent with their expense obligations. Facts ¶¶ 55, 78-79. When these accounts ran dry, they were replenished with New Funds' cash without regard to which of the Funds had incurred the expenses in the first place. Facts ¶¶ 34, 63, 91.

Moreover, Defendants' accounting system did not and could not give them an accurate picture of the Funds' expenses and revenues. Prior to 2007, the Defendants did not reconcile the "fund financials" more than once a year. Facts, ¶¶ 92-93. From some point in 2007 through 2008, they did so "a couple of times." *Id.* In other words, for many years the Defendants did not match up assets, investments, liabilities and partners' capital more than once per year. *Id.* Nor did they review the contributions and expenditures from the legal reserve and operating accounts.

Facts ¶ 93.  The Defendants waited almost two years before preparing audited financial statements for the funds.  Facts ¶ 94.  CFO Saunders summed up these accounting problems by candidly admitting, "it was challenging at best to just put out financial statements."  Facts ¶ 95.

## VI.   By 2007, Southridge's Key Personnel Were Aware Legal Expenses Were Not Being Booked to the Funds and the Funds' Books Did Not Balance

By April 2007, Southridge's CEO, CFO and assistant controller were aware that legal expenses were not being charged back properly to the Funds.  Facts ¶ 97.  The Defendants admit that their accounting staff should have taken steps at that time to ensure that the problem was stopped and corrected. Facts ¶ 100.  Hicks admitted that as CEO he should have overseen any such efforts.  Facts ¶ 101.  But Hicks failed to do so, and the New Funds continued to pay for expenses of the Old Funds through the middle of 2008.  Facts ¶¶ 101, 102.  And, as before, these expense payments continued to be accounted for improperly on the Funds' books.  Facts ¶ 102.

The Defendants also knew, at least as of 2006, that the consolidated financial statements for the Southridge entities and the Funds were "out of balance."  Facts ¶¶ 103, 105.  In other words, there was "a discrepancy in the assets of the funds versus the funds liabilities and equity."  Facts ¶ 104.   In 2006, the out-of-balance position for 2004 had been calculated as approximately $800,000.  Facts ¶ 105.  By March 2008, the out-of-balance position for 2007 had increased to approximately $1,500,000.  Facts ¶ 106.  Just a few months later, in July or August 2008, the out-of-balance position was determined to be in the range of $7 million to $8 million.  Facts ¶ 107.

This out-of-balance position was largely caused by the Defendants' mishandling of legal and administrative expenses.  Facts ¶ 107.  Only when the out-of-balance position grew to such a large amount did the Defendants decide they should take some (albeit deficient) remedial steps and make some (albeit misleading) disclosure to investors.

**VII.    In 2008, Southridge "Repaid" the New Funds with Illiquid Securities**

In July or August 2008, when the out-of-balance position had grown to more than

$7 million dollars, Southridge finally began to address the issue in the face of a looming audit by

its independent accounting firm.  Facts, ¶¶ 104,109.  As part of that process, Southridge

purportedly reviewed all legal and administrative expenses and "reclassified" them to charge

them to the appropriate Funds.  Facts, ¶ 72, 76.  When the dust cleared, the Defendants

determined that more than $5.8 million in legal and administrative expenses had been paid by the

wrong funds—principally Southridge Partners.  Facts, ¶ 36, 76.

To compensate for that "error," the Defendants transferred back $0 cash to the New

Funds.  Facts, ¶ 110-111.  Instead, in December 2008, the New Funds (and their investors)

received the securities of two entities, Technest and Fonix.  Facts ¶ 112.  The Technest securities,

which represented half the transfer by book value, could not be liquidated until sometime in 2011

or 2012.  Facts ¶ 112-114.  The Fonix securities, which represented the other half of the transfer,

could not be liquidated as of the end of January 2013, and so investors in the New Funds still

have not received this half of their money back.  *Id.*

At the time of the so-called "reallocation" of expenses and assets, the Defendants

promised to provide further compensation to the New Funds if the securities transferred to them

proved inadequate to make them whole.  Facts ¶ 116.  Over four years later, the Defendants have

yet to transfer any additional assets to the New Funds.  Facts ¶ 117.

**VIII.   The Undisputed Facts Do Not Support the Defendants' Attempt to Portray the
          Misappropriation from the New Funds as a Mere Bookkeeping Error**

Even though he had known about the problem for years, it was not until February 2009

that Hicks told investors in the New Funds that certain administrative and legal expenses had

been "incorrectly allocated."  Facts ¶ 109.  Hicks failed to mention the time period, amount, or

frequency of the misappropriations, or his featured role in them.  Instead, he reported simply that Southridge had found the problem during "our year-end reconciliation and in preparation for the annual audit."  *See* Facts ¶ 109 & PX-26.

It was not accurate to describe the problem as a mere accounting error, as Hicks did in his letter and as the Defendants have tried to do several times since.  Indeed, the Defendants now concede, as they must, that Southridge's inadequate accounting practices were not the reason over $5 million made its way from the New Funds' accounts to the Old Funds' lawyers.  Facts ¶¶ 121, 122.  The real reason:  Hicks took cash from the New Funds because the Old Funds did not have sufficient cash to fully pay their legal expenses themselves.  Facts ¶¶ 68-69.

## ARGUMENT

### I.    The Summary Judgment Standard

Summary judgment should be granted when the pleadings, affidavits, and other supporting papers permitted by Fed. R. Civ. P. 56(c) show that there is no genuine issue of material fact and the moving party is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986).   A party opposing summary judgment has the burden to respond by providing specific facts to defeat summary judgment.  Fed. R. Civ. P. 56(e); L.R. 56(a)(2) & (3).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).

"In an SEC action seeking injunctive relief, the court should not hesitate to grant a request for summary judgment if the defendant fails to demonstrate that there is a genuine issue for trial."  *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 392 (S.D.N.Y. 2010) (quoting *SEC*

*v. Dimensional Entm't Corp.,* 493 F. Supp. 1270, 1274 (S.D.N.Y.1980)); *see also SEC v. Research Automation Corp.,* 585 F.2d 31, 33-35 (2d Cir. 1978).

Here, the Commission has presented undisputed facts – through the Defendants' own testimony, sworn interrogatory answers, and other admissions – that the Defendants violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & (2)].

## II.     Sections 206(1) and 206(2) of the Advisers Act

Congress created Section 206 of the Advisers Act to prevent fraudulent practices by investment advisers.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). To accomplish this goal, the "extent of conduct subject to liability under the Advisers Act is broad."  *SEC v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006).  Among other things, Section 206 makes it unlawful for an investment adviser, by use of the mails or any means of interstate commerce, to (1) employ any device, scheme or artifice to defraud, or (2) engage in any act, transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client.  *See* 15 U.S.C. §§ 80b-6(1) & (2); *Aaron v. SEC*, 445 U.S. 680, 691-93, 697 (1980).  These antifraud provisions apply to "any investment adviser" whether registered with the SEC or not.  *See* 15 U.S.C. § 80b-2(11) (defining investment adviser).  Scienter is required for a claim under Section 206(1) but not Section 206(2).  *See SEC v. Pimco Advisors Fund Mgmt. LLC,* 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004); s*ee also Capital Gains*, 375 U.S. at 184 & 191-92; *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979).

The Advisers Act "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser-consciously or unconsciously-to render advice which was not disinterested."  *Capital Gains,* 375 U.S. at 191-92.  Section 206 "establishes a statutory fiduciary duty for investment advisers to act for the

benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 17 (1979); *see also Burks v. Lasker,* 441 U.S. 471, 482 n.10 (1979); *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 472 n.11 (1977); *Capital Gains,* 375 U.S. at 191-92.

The Defendants' conduct is precisely the kind of conduct that the Advisers Act is intended to prevent.  Investment advisers must act in the best interest of their clients.  *See, e.g., SEC v. Moran*, 922 F. Supp. at 896.  Here, the Defendants have done the exact opposite – raiding the cash of some of their clients (the New Funds) to benefit other clients (the Old Funds) in utter disregard of their statutory fiduciary duties.

## III.   The Defendants' Misappropriation of the New Funds' Cash to Pay the Old Funds' Expenses Violated Sections 206(1) and 206(2) of the Advisers Act

### A.   The Defendants' Conduct and the Resulting Harm is Undisputed

There are no genuine issues of material fact concerning what happened here.  As outlined above, over the course of four years, Hicks caused millions in cash to be taken from the New Funds' bank accounts and used to pay legal and administrative expenses of the Old Funds.  The Defendants have admitted as much, and they further have admitted that this conduct was improper.  Facts ¶ 35. Thus, no reasonable jury could find otherwise.

It is also undisputed that the ramifications for the New Funds were serious.  Cash that should have been available to make investments or meet redemption requests was not.  Facts ¶¶ 28-29, 45.  The Defendants acknowledge that the lack of cash was a principal reason why they were unable to execute their investment strategy for the New Funds.  Facts ¶ 46.  Indeed, nearly 12 percent of the total assets of the Southridge Partners Fund were diverted for the benefit of investors in the Old Funds.  Facts ¶ 40.  Investors in the New Funds were supposed to be

shielded from the litigation burden of the Old Funds.  Facts ¶ 30.  Instead, they were forced to shoulder that costly burden.  The New Funds were supposed to be more liquid than the Old Funds.  Facts ¶ 32.  Instead, the New Funds ended up being stuck with illiquid securities as "compensation" for years of footing the bill for the Old Funds' expenses.  Despite their ongoing inability to fully exit the investments transferred from the Old Funds to New Funds, the Defendants have failed to fulfill their promise to make up the difference with additional assets. Facts ¶ 116, 117.

All of this avoidable harm was inflicted by none other than the investment advisers who were supposed to be serving the best interests of the New Funds and without disclosure to investors in the New Funds.  The undisputed facts simply leave no room for doubt that the Defendants breached their fiduciary duty and that this course of misconduct operated as a fraud and deceit upon the New Funds and their investors.

### B.  The Defendants Acted with Scienter

Scienter may be established through evidence of knowing misconduct or recklessness. *SEC v. Wall Street Pub. Inst., Inc.*, 591 F. Supp. 1070, 1084 (D.D.C. 1984) (citing *Steadman*, 603 F.2d at 1135); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009); *SEC v. Gruss*, 859 F. Supp. 2d 653, 659 (S.D.N.Y. 2012).

Knowing misconduct encompasses the "intent to deceive, manipulate, or defraud." *Van Cook v. SEC,* 653 F.3d 130, 138 (2d Cir. 2011) (quoting *SEC v. First Jersey Sec.*, 101 F.3d 1450, 1467 (2d Cir. 1996)); *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). Recklessness encompasses conduct that is "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger [of fraud] was either known to the defendant or so obvious that the defendant must have been aware of it."  *SEC v. KPMG LLP,* 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (quoting *Rothman v. Gregor,* 220 F.3d

81, 90 (2d Cir.2000)).  Under either test, the Defendants' scienter is well established by the undisputed evidence.[2]

### 1.     The Defendants Acted Knowingly and Intentionally

All of the evidence – most notably, the sworn testimony of the Southridge witnesses – confirms that the Defendants knowingly and intentionally reached into the coffers of the New Funds in order to prop-up the legal reserve and pay expenses of the Old Funds.  There is no contrary evidence in the record.  And there is no credible basis for any argument that these monies were misappropriated "inadvertently" or by "mistake."

As outlined above, week after week, CEO Hicks received a regular report detailing which funds and accounts had cash available, and which did not.  He needed to know this information: he was in charge of making investments for the funds and paying expenses associated with those investments.  Month after month, Hicks received the legal bills for the funds and determined which funds were responsible for which expenses.  The vast majority of the legal expenses were attributable to the Old Funds.  *See, e.g.,* Facts ¶¶ 27-32.  Indeed, the Old Funds had been closed to new investors because those funds were mired in multiple ongoing lawsuits.  Facts ¶ 30.  Yet time and again, year after year, when the legal reserve was low, Hicks instructed the accounts payable clerk to transfer cash into the legal reserve account from one of the New Funds' accounts.

The clerks needed authorization to pay legal expenses and to make these transfers between accounts.  Facts ¶¶ 50, 60-61.  They did not do so on their own, let alone by happenstance or inadvertence.  They were following instructions.  Someone told them to take

---

[2] "Proof of scienter under the securities laws need not be direct, but may be a matter of inference from circumstantial evidence."  *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999) (internal citations and quotations omitted).

money from the New Funds to meet Southridge's myriad legal expenses, and the testimony is clear: that someone was Hicks. Facts ¶¶ 60-63. Hicks knew he was taking cash from the New Funds inappropriately, and he did so purposely.

The conduct of Hicks, and thus that of Southridge, was absolutely knowing and intentional. The scienter of a company's officer may be attributed to the company where, as here, there is no dispute that the officer was acting within the scope of his apparent authority, as a corporation can only act through its employees and agents. *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 423-24 (S.D.N.Y. 2007); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 811-13 (2d Cir. 1975) (affirming antifraud injunction against a company based on the conduct of an officer acting within the scope of his authority); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 101 (2d Cir. 2001).

In addition, starting in 2006 (not long after he was hired) and going forward, CFO Saunders was aware of significant discrepancies between the assets of the Funds and the Funds' liabilities and equity. Facts ¶ 105. In other words, the Funds' books did not balance. By April 2007, Saunders was also aware that legal expenses were not being charged back to the individual Funds, and he shared this information with Hicks. Facts ¶ 97. Despite senior management's knowledge of both problems, the New Funds continue to pay for the expenses of the Old Funds, and the Funds' out-of-balance position continue to grow. These undisputed facts further establish that Defendants engaged in knowing misconduct.

Finally, when the size of the out-of-balance position could no longer be ignored, the Defendants engaged in a further sleight of hand. They told investors, and later the Commission, that the misappropriation of cash resulted from "misallocations" of expenses between the funds; the suggestion being that expenses owed by one fund were mistakenly billed to another fund.

But when asked by the Commission to identify those misallocations, Defendants stated they could not – supposedly "because to ensure any improper allocation was corrected, the defendants reviewed all legal expenses for this time period."  Facts ¶ 71.  Although Hicks verified this interrogatory response, he was later forced to concede that it made no sense.  Facts ¶¶ 73-74.  Logically, the Defendants' review of all legal expenses should have made possible, rather than precluded, the identification of the expenses claimed to be "misallocated" and, in turn, "reallocated."  The real reason that the Defendants did not identify the purported "misallocations" of expenses is that those expenses were never "allocated" in the first place.  Facts ¶ 120.[3]

The Defendants' shoddy accounting practices only further demonstrate their disregard for the fiduciary duty they owed to their clients.  By no means, however, do those accounting deficiencies explain *why* the New Funds were made to subsidize the legal reserve in the first place.  Southridge's Rule 30(b)(6) witness belatedly admitted this at the close of discovery.  Thus, contrary to what investors were led to believe, monies were not taken from the New Funds because bills were incorrectly charged to the New Funds.  Monies were taken from the New Funds because Hicks said so.  As CEO of Southridge and the sole person who authorized the payment of expenses and decided what resources to use to pay them, Hicks was responsible for making sure that client funds were not misappropriated.  Instead, month after month, year after year, he directed his subordinates to take cash from the New Funds to backstop the liabilities of

---

[3] Needless to say, the Southridge accounting staff faced a conundrum.  It would have been problematic to record legal and administrative expenses of the Old Funds on the books of the New Funds.  And it would have been equally problematic to charge the expenses to the cash-strapped Old Funds, given that the expenses were actually paid by the New Funds.  Hence, it is telling that the expenses were not charged back at all.

the Old Funds.  Presented with this uncontroverted evidence, no jury could reasonably find that the Defendants' misconduct was other than knowing and intentional.

### 2.    At a Minimum, the Defendants Acted Recklessly

Even if it were not so plain that Defendants engaged in intentional misconduct, any reasonable jury would find that Defendants were reckless.  In the Advisers Act context, the "standards of ordinary care" are stringent, because an adviser owes a fiduciary duty to his clients. *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. at 17; *Capital Gains,* 375 U.S. at 191-92.

The undisputed facts show that the Defendants' conduct was reckless, that is, "highly unreasonable and an extreme departure from the standards of ordinary care" for an investment adviser to a hedge fund.  *SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998) (citations and internal quotation marks omitted)).   Among other things, the Defendants' sworn testimony and other admissions establish that:

- The Defendants had "inadequate accounting procedures for tracking expenses paid by the general partner/investment manager on behalf of the managed funds."  Facts ¶ 77.

- The Defendants had insufficient accounting controls to ensure expenses were being properly recorded on the books and allocated among the funds.  *Id*. ¶ 96.

- The accounting issues plaguing the funds were systemic.  According to CFO Saunders, they involved "[m]any problems over multiple years."  *Id*. ¶ 88.  In the words of CEO Hicks, there were "a whole series of processes that broke down."  *Id*. ¶ 89.

- The Defendants' CFO provided no training or instructions to the accounting staff regarding the processing and paying of legal expenses, despite frequent employee turnover in this area.  *Id*. ¶ 84.

- Key expense information failed to pass between the necessary members of the Defendants' accounting staff.  *Id*. ¶¶ 78-83.

- The Defendants' accounting system did not and could not give them an accurate picture of the Funds' expenses and revenues.  *Id*. ¶ 92.

- Prior to 2007, the Defendants did not reconcile the "fund financials" more than once a year.  From some point in 2007 through 2008, they did so "a couple of times."  *Id*.  In other words, for many years the Defendants did not match up assets, investments,

liabilities and partners' capital more than once per year.  Nor did they review the contributions and expenditures from the legal reserve and the operating accounts.  *Id*. ¶ 93.

- The Defendants, to this day, cannot determine (a) the dates when legal and administrative expenses were misallocated or (b) the amount of cash that was in each fund at the time the misallocations occurred.  *Id*. ¶¶ 71-72.

- The Defendants, to this day, have failed to explain why cash was taken from the New Funds to replenish the legal reserve.  *Id.* ¶ 123.

- According to Hicks, he did not monitor whether there was sufficient cash to cover expenses, even though he was the one directing how and when to pay those expenses, and even though he was provided with a report of available cash in each account every week.  *Id*. ¶ 91.

- The Defendants did not budget for or forecast legal expenses on a monthly or quarterly basis.  *Id*. ¶ 90.

- The Defendants' mishandling of legal and administrative expenses of the Old Funds impaired the liquidity and the execution of the investment strategy of the New Funds.  *Id.* ¶¶ 44-46.

Moreover, the Defendants refused to see the obvious or investigate the doubtful when it came to the payment of legal and administrative expenses.  *SEC v. Pentagon Capital Mgmt. PLC*, 844 F. Supp. 2d 377, 411 (S.D.N.Y. 2012) ("An egregious refusal to see the obvious, or to investigate the doubtful, may also give rise to an inference of recklessness. Accordingly, a defendant cannot plead ignorance of facts where there are warning signs or information that should have put him on notice of either misrepresented or undisclosed facts.")  For example, the Defendants knew in 2006 that the Funds' books were out of balance, yet they did not undertake a comprehensive review of the allocation of expenses among the Funds until mid-2008, by which point the imbalance had grown from $800,000 to as much as $8 million.  This out-of-balance position was caused in significant part by the Defendants' failures to properly pay legal and administrative expenses of the Funds.

Yet Defendants were aware by no later than April 2007, that legal expenses were not being charged back properly to the Funds.  Despite this knowledge, Defendants failed to fully investigate and the problem persisted for over another year.  Neither Southridge's CEO nor CFO took any steps to ensure that Southridge's purported accounting protocols were being followed.[4]

The course of conduct described above falls so far below what the law expects of investment advisers – to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients – that there can be no genuine issue for trial on the issue of the Defendants' recklessness.  *See, e.g., SEC v. Lyttle*, 538 F.3d 601, 602–05 (7th Cir.2008) (where there is overwhelming evidence of severe recklessness and the defendants fail to bring forward countervailing evidence, summary judgment for the plaintiff can be appropriate in securities fraud cases); *SEC v. Brown*, 579 F. Supp. 2d 1228, 1236 (D. Minn. 2008).[5]

### C.      The Defendants Were Investment Advisers and Used Interstate Commerce

The Defendants have admitted they were investment advisers as defined by Advisers Act Section 202(a)(11) ("any person who, for compensation, engages in the business of advising others, … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities").  The Second Circuit has held that persons who manage the funds of others for compensation are "investment advisers" within the meaning of the statute.  *Abrahamson v.*

---

[4] Thus, even if Defendants (contrary to their own admissions) could maintain that accounting errors somehow explain the pilfering of the New Funds, Defendants had been on notice and aware of those problems for years.

[5] For all the same reasons and more, negligence-based liability under Section 206(2) is established by the undisputed facts presented on this Motion.  Acting favorably toward one set of clients over another, failing to monitor client accounts sufficiently to ensure fairness between clients, misallocations between clients, and placing one's own interests before one's clients all breach an adviser's fiduciary duty.  *SEC v. Moran*, 922 F. Supp. 867, 898 (S.D.N.Y. 1996) (misallocation of investments between clients to favor personal and family accounts).

*Fleschner,* 568 F.2d 862, 870 (2d Cir. 1977); *SEC v. Berger,* 244 F. Supp. 2d 180, 192-93 (S.D.N.Y. 2001).  "Hedge fund general partners meet the definition of 'investment adviser' in the Advisers Act."  *Goldstein v. SEC*, 451 F.3d 873, 876 (D.C. Cir. 2006) (*citing Abrahamson*).  Hicks also qualifies as an investment adviser as one who helped manage the Funds' portfolios, advised victims to invest with these Funds, and distributed investment reports to investors in the Funds.  *See U.S. v. Onsa*, 2013 WL 789182, at * 4 (E.D.N.Y. Mar. 1, 2013) (finding hedge fund portfolio manager was an investment adviser); *SEC v. Juno Mother Earth Asset Mgmt., LLC,* 2012 WL 685302, at *6 (S.D.N.Y. Mar. 2, 2012) (holding that allegations that portfolio manager of hedge fund and others received incentive fees "clearly establish that the individual defendants managed the funds of others for compensation and hence qualify as investment advisers under the Advisers Act"); *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (relying upon *Abrahamson* in holding that hedge fund manager was investment adviser).

The Defendants, located in both Connecticut and New York, knowingly used the means of interstate commerce in their fraud.  It is undisputed that the conduct at issue involved the transfer of funds between national banks and the payment of law firms and other vendors in multiple states.  Facts ¶ 42.  The firms Southridge paid for legal expenses were located in, for example, Texas and Maryland.  Facts ¶ 43. The banks holding and transferring these funds were located in multiple states.  Facts ¶ 42.  The Defendants mailed a letter to the New Funds' investors providing a false explanation for the misappropriation of client assets.  Facts ¶ 109.

## APPROPRIATE RELIEF

While the Commission's motion is for partial summary judgment only as to one of the five counts of the Complaint, the Commission respectfully requests that the Court enter a permanent injunction against future violations of the Advisers Act and hold a hearing to

determine the appropriate amount of disgorgement (with prejudgment interest) and civil penalties.  *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 392 (S.D.N.Y. 2010).  The Commission believes that such relief is warranted and that doing so would aid in resolving this case, and, most importantly, would protect investors from further harm.

**I.**     **The Court Should Enter a Permanent Injunction against Future Violations of the Advisers Act**

Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] authorizes a court to enter a permanent injunction against future violations of the Act.  To obtain a permanent injunction, the Commission must show that the Defendants violated the Advisers Act and that there is a reasonable likelihood that, if not enjoined, they will engage in future violations.  *SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.3d 90, 99-100 (2d Cir. 1978).

Courts in this Circuit weigh the following factors when considering whether to enter a permanent injunction in the Commission's enforcement actions:  (1) whether the defendant has been found liable for the illegal conduct; (2) the degree of scienter exhibited; (3) whether the violation was an isolated incident; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, by reason of his professional occupation, defendant might be in a position that may provide opportunity for further violations.  *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996).

Here, the Defendants engaged in a four-year long pattern of illegal conduct, compounded by their failure to this day to make whole the clients from whom they admit they improperly took money.  They continue to deny that they violated their fiduciary duty, and they continue to manage millions of dollars of investor money.  A permanent injunction is strongly warranted by the evidence in this case.

**II.        The Court Should Hold a Hearing on Disgorgement and Civil Penalties**

A court has broad equitable power to order the disgorgement of ill-gotten gains obtained through violations of the federal securities laws.  *SEC v. First Jersey Sec., Inc.*, 1201 F.3d 1450, 1474 (2d Cir. 1996).  Here, the basis for disgorgement is apparent.  The Defendants improperly took cash from the New Funds to pay legal bills for litigation to which they were parties and transferred illiquid securities in exchange.  Four years later, investors in the New Funds still have not received back all, or even half, of their money.

Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)] authorizes a court to impose a civil penalty for certain violations of the Act.  When a defendant's violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement and … such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," the highest tier of penalty is warranted.  Here, the Defendants' conduct definitely involved both fraud and the substantial loss that justifies a top-tier penalty.[6]

A hearing on these remedies would allow the parties to present further evidence on the proper amount of each component.

### CONCLUSION

For all the foregoing reasons, the Commission respectfully requests this Court grant the Commission's Motion for Summary Judgment against the Defendants.

_____

[6] During the applicable time period, the penalties were set at $150,000 for natural persons and $650,000 for other persons (entities) per violation where there was a substantial loss to others or the gross amount of the pecuniary gain to the defendants as a result of the violation. 17 C.F.R. §201.1004 (Mar. 3, 2009); 15 U.S.C.§80b-9(e).

Respectfully Submitted,

/s/ Marc Jones
Marc Jones (phv05721)
    Senior Enforcement Counsel
Michael D. Foster (phv04800)
    Senior Trial Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8947 (Jones direct)
(617) 573-4590 (fax)
jonesmarc@sec.gov
Local Counsel:
John B. Hughes (Fed. Bar No. CT-05289)
 Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373 (fax)

Dated: March 18, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2013, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this document through the Court's CM/ECF System.

/s/ Marc J. Jones
Marc J. Jones (phv05721)
Senior Enforcement Counsel
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8947
(617) 573-4590 (fax)
jonesmarc@sec.gov