# EXHIBIT 9

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No. B-02236-A
SOUTHRIDGE CAPITAL MANAGEMENT, LLC )

WITNESS:  Thomas Saunders

PAGES:    1 through 181

PLACE:    Securities and Exchange Commission

          Boston District Office

          33 Arch Street, Suite 2300

          Boston, Massachusetts

DATE:     Tuesday, December 22, 2009

The above-entitled matter came on for hearing, pursuant to notice, at 11:21 a.m.

RECEIVED

JAN 07 2010

SECURITIES AND EXCHANGE COMMISSION
BOSTON REGIONAL OFFICE

Diversified Reporting Services, Inc.

(202) 467-9200

### Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4     LAWRENCE PISTO, ESQ.
5     KEVIN KELCOURSE, ESQ.
6     Division of Enforcement
7     Securities and Exchange Commission
8     33 Arch Street, Suite 2300
9     Boston, Massachusetts 02108
10
11 On behalf of the Witness:
12    DOUGLAS R. JENSEN, ESQ.
13    BARRY H. JUNKER, ESQ.
14    Park & Jensen LLP
15    369 Lexington Avenue
16    New York, New York 10017
17    (212) 661-3966

### Page 3

CONTENTS

| WITNESS | EXAMINATION |
|---|---|
| Thomas Saunders | 4 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 65 | Subpoena | 7 |

### Page 4

1   PROCEEDINGS
2       MR. PISTO: We are on the record at 11:21 a.m., on
3   December 22, 2009, at the offices of the United States
4   Securities and Exchange Commission in Boston, Massachusetts.
5       Mr. Saunders, my name is Lawrence Pisto, and to my
6   left is Kevin Kelcourse. We are each members of the staff of
7   the Division of Enforcement of the Securities and Exchange
8   Commission, and we have both been designated officers of the
9   Commission for purposes of this proceeding.
10      Mr. Saunders, would you please raise your right
11  hand?
12      Whereupon,
13             THOMAS SAUNDERS
14  was called as a witness and, having been first duly sworn,
15  was examined and testified as follows:
16             EXAMINATION
17      BY MR. PISTO:
18      Q  Would you please state and spell your full name for
19  the record?
20      A  Thomas Saunders. It's T-h-o-m-a-s; and Saunders,
21  S-a-u-n-d-e-r-s.
22      Q  Thank you. May I please have your home address and
23  Social Security number?
24      A  25 Grand Cove Way, Edgewater, New Jersey 07020.
25  And my Social Security is ███████

### Page 5

1       MR. PISTO: Thank you. Mr. Saunders, this is an
2   investigation by the United States Securities and Exchange
3   Commission in the matter of Southridge Capital Management,
4   B-02236, to determine whether there have been violations of
5   certain provisions of the federal securities laws. However,
6   the facts developed in this inquiry might constitute
7   violations of other federal or state civil or criminal laws.
8       Mr. Saunders, prior to the opening of the record,
9   you were provided with a copy of the Formal Order of
10  Investigation in this matter. It will be available for your
11  examination during the course of this proceeding. Mr.
12  Saunders, have you had an opportunity to review the Formal
13  Order?
14      THE WITNESS: Yes.
15      MR. PISTO: Thank you. Also prior to the opening
16  of this record, you were provided with a copy of the
17  Commission's Supplemental Information Form No. 1662. A copy
18  has previously been marked as Commission Exhibit No. 1.
19  Also, Mr. Saunders, a copy of this form was also attached to
20  the subpoena that we sent you.
21      Mr. Saunders, have you had an opportunity to review
22  Exhibit No. 1, Form 1662?
23      THE WITNESS: Yes.
24      MR. PISTO: Do you have any questions concerning
25  this form?

**Page 14**

1  spoke to him, and that led to a job, led to a consulting job.
2     Q  And Steve would be Mr. Hicks?
3     A  Mr. Hicks, yes.
4     Q  Who is Mr. Hicks?
5     A  What do you mean, who is he? He is the managing
6  member of the general partner of Southridge.
7     Q  Okay, thank you. And how did you know Mr. Hicks?
8     A  I knew -- I met Steve Hicks in 1982 at Norton.
9     Q  Had you stayed in contact with Mr. Hicks?
10     A  Off and on.
11     Q  So it would be fair to say you weren't close
12  friends, but you stayed in contact with him?
13     A  Correct. That would be correct.
14     Q  Was Mr. Hicks involved in -- when you were working
15  at Garnet Advisors, was Mr. Hicks involved in that job? I
16  mean, did you -- you know, was he a person you worked with or
17  someone you dealt with in the course of your business?
18     A  Yes. Occasionally, yes.
19     Q  Can you explain what those interactions involved?
20     A  It involved finding these direct stock purchase
21  plans for Southridge to participate in.
22     Q  When you worked at Garnet, was Southridge the -- I
23  don't know what the term -- biggest client or the partner of
24  Garnet in these deals that you were looking to find? Would
25  it be fair to say that Southridge was involved in --

**Page 15**

1     A  Yes.
2     Q  -- deals that you were trying to find?
3     A  Yes.
4     Q  How were they involved?
5     A  They were involved in funding many of them.
6     Q  So the way it work is Garnet, through you, would
7  find these deals, and Southridge would fund them?
8     A  Correct.
9     Q  Thank you. Was it your decision to approach Mr.
10  Hicks, or did Mr. Hicks approach you about working at
11  Southridge?
12     A  I approached him.
13     Q  How did -- I think you already said this, but how
14  did Mr. Hicks react?
15     A  He wanted me to come and talk to him about it, and
16  he offered me a consulting position.
17     Q  When did you start?
18     A  In May of '06, I believe.
19     Q  What did your duties entail as part of that
20  consulting job?
21     A  It was a project, looking into the -- into making
22  adjustments on general ledgers for many of the entities
23  there. I was working for the Controller of Southridge
24  Capital at the time.
25     Q  And who was the Controller of Southridge Capital at

**Page 16**

1  the time?
2     A  Deborah Case.
3     Q  And how long did the consulting arrangement last?
4     A  Until the beginning of July.
5     Q  July of 2006?
6     A  Yes.
7     Q  So May, June, July of 2006, you consulted at
8  Southridge?
9     A  Yes. Actually, just the beginning of July.
10     Q  Okay, the beginning of July. And what happened
11  then?
12     A  The Controller left, and I took over the duties of
13  the Controller.
14     Q  That's Ms. Case we're referring to?
15     A  Yes.
16     Q  Do you know why she left?
17     A  I'm not sure.
18     BY MR. KELCOURSE:
19     Q  Do you have any understanding as to why she left?
20     A  No, I don't.
21     Q  She didn't tell you why she was leaving?
22     A  No.
23     Q  Did Mr. Hicks tell you why? Was she fired?
24     A  I don't know for sure.
25     Q  Was she asked to leave in any way?

**Page 17**

1     A  I don't know.
2     Q  Well, what do you think? You were there. What do
3  you think?
4     A  It's my understanding that she was let go.
5     Q  Do you have any understanding as to why she was let
6  go?
7     MR. JENSEN: I mean, these questions are fine, as
8  long as he's made it clear he's speculating; he doesn't know.
9     THE WITNESS: It's my understanding that she wasn't
10  that competent at her work.
11     BY MR. KELCOURSE:
12     Q  So it was a competence issue, as opposed to, say a
13  dishonesty issue, or something like that?
14     A  That's my understanding.
15     Q  What is the basis of that understanding?
16     A  Just discussions with Steve.
17     Q  What did he tell you about Ms. Case?
18     A  That she wasn't competent.
19     Q  What was your impression of her while you were
20  there? You were working with her for three months. Did you
21  think she was competent?
22     A  No.
23     Q  Why not?
24     A  Well, she was directing me on booking certain
25  transactions into the general ledger, and she set me up

Page 22

1   he's in his early 60s.
2   Q   Were you happy with Mr. Layton's work?
3   A   Not a hundred percent.
4   Q   What exactly did he do at Southridge?
5   A   He was the Accounts Payable person.
6   Q   What does that mean? What did he have to do?
7   A   He had to pay bills, and occasionally wire money.
8   But mostly paying the bills.
9   Q   All right, is there anybody else who, since you
10  began there, has left the Accounting Department?
11  A   Robert Truitt.
12  Q   Again, I'm sorry to ask you; do you know how that
13  last name is spelled?
14  A   T-R-U-I-T-T.
15  Q   Thank you. And what did Mr. Truitt do?
16  A   He replaced Mr. Layton.
17  Q   How long was he at Southridge?
18  A   Three or four months.
19  Q   When did he leave?
20  A   It was the end of January of '08.
21  Q   Do you know when Mr. Truitt left?
22  A   He was asked to leave.
23  Q   Who made that decision to ask him to leave?
24  A   I did.
25  Q   Why did you make that decision?

Page 23

1   A   Because he wasn't fulfilling his duties.
2   Q   How as he failing to fulfill his duties?
3   A   He wasn't -- he had had a job before as an Accounts
4   Payable person, and he really didn't know how to do bank
5   reconciliations. So we let him go.
6   Q   And after Mr. Truitt left, who replaced him?
7   A   Jimmy Girolamo.
8   Q   And Mr. Girolamo is still there?
9   A   Yes.
10  Q   Is there anyone else you can think of in the
11  Accounting Department who has been there and left since your
12  tenure began?
13  A   No.
14  Q   Who do you work with at Southridge?
15  A   What do you --
16  Q   Who do you supervise, and who do you report to?
17  A   I supervise much of the work of Jimmy Girolamo and
18  Cynthia Bishop.
19  Q   Anyone else?
20  A   No.
21  Q   And who do you report to?
22  A   I report to Steve.
23  Q   Anyone else?
24  A   Henry, you know, also. But mostly Steve.
25      BY MR. KELCOURSE:

Page 24

1   Q   When you say Henry, you mean Henry Sargeant?
2   A   Henry Sargeant.
3   Q   What does Cynthia Bishop do?
4   A   Cynthia Bishop is the Assistant Controller, and she
5   does the accounting for the five operating funds.
6   Q   What is your position there?
7   A   CFO.
8   Q   Is there a Controller?
9   A   No. In effect, Cynthia acts as Controller, but her
10  technical title is Assistant Controller.
11  Q   Have you been satisfied with the performance of Mr.
12  Girolamo?
13  A   Yes.
14  Q   How about Ms. Bishop?
15  A   Yes.
16  Q   No performance issues with them at --
17  A   No.
18  Q   -- the present time, at least?
19  A   I don't.
20      BY MR. PISTO:
21  Q   Mr. Saunders, I'm going to get back into this in a
22  second, but before I forget, I just wanted to ask you a few
23  more background questions. I believe you provided your
24  residential address. May I please have your telephone
25  numbers?

Page 25

1   A   Yes. 201/943-8737.
2   Q   Is that your home number?
3   A   Yes.
4   Q   What is your work number?
5   A   My work number is 203/431-8300, extension 114.
6   Q   Thank you. Any cell phone numbers?
7   A   201/390-6471.
8   Q   Thank you. And what's the provider for your cell
9   phone?
10  A   Verizon.
11  Q   Mr. Saunders, have you ever testified in an
12  investigation by the Commission or its staff?
13  A   I've provided testimony, yeah. I don't know
14  whether it's actually testimony.
15      MR. JENSEN: You said it was an interview, I
16  believe.
17      THE WITNESS: It was an interview.
18      BY MR. PISTO:
19  Q   When was that?
20  A   February of 2006, I believe.
21  Q   And did the matter involve?
22  A   It involved a follow-up of an NASD investigation.
23  Q   And what was the subject matter?
24  A   The subject matter were some transaction done in
25  the Garnet Offshore Fund.

```
                                                    Page 54
 1    A   To Sunodia.
 2    Q   Would there be any reason for any other -- any
 3   other reason for transfers of money from Southridge Capital
 4   Management to Sunodia, other than capital withdrawal?
 5    A   Well, just if Sunodia had its own minor bills to
 6   pay.
 7    Q   Such as what?
 8    A   Such as accounting services.
 9    Q   What sort of capital withdrawal would there be from
10   Southridge Capital Management?
11    A   Can you be specific?
12    Q   Well, let's step back. What is Southridge Capital
13   Management?
14    A   Southridge Capital Management is the general
15   partner of Sovereign.
16    Q   That's it?
17    A   At the moment, yes.
18    Q   Has Southridge Capital Management been the general
19   partner of any other Southridge fund?
20    A   Yes.
21    Q   Which other Southridge funds has Southridge Capital
22   Management been the general partner of?
23    A   Southridge Partners.
24    Q   Any other ones?
25    A   No, I don't believe so.
```

```
                                                    Page 55
 1    Q   Who currently is the general partner of Southridge
 2   Partners?
 3    A   Southridge Advisors.
 4    Q   When did Southridge Advisors become the general
 5   partner of Southridge Partners?
 6    A   I believe it was the end of August of 2003.
 7    Q   Why was that change made?
 8    A   I don't know.
 9    Q   What is Southridge Advisors?
10    A   It's the general partner of Southridge Partners.
11    Q   Who controls Southridge Advisors?
12    A   What do you mean, who controls it?
13    Q   Who controls it?
14    A   Steve Hicks.
15    Q   Who owns Southridge Advisors?
16    A   I'm not sure.
17    Q   Does Sunodia own Southridge Advisors?
18    A   I don't believe so.
19    Q   Do you do any work for Southridge Advisors?
20    A   Yes.
21    Q   What kind of work do you do for Southridge
22   Advisors?
23    A   Similar to what I do for Southridge Capital
24   Management.
25    Q   But you know who owns Southridge Capital
```

```
                                                    Page 56
 1   Management?
 2    A   Yes.
 3    Q   But you don't know who owns Southridge Advisors?
 4    A   I believe it's Mary Hicks.
 5    Q   Why would Mary Hicks own Southridge Advisors?
 6    A   I don't know.
 7    Q   So currently, Southridge Capital Management is the
 8   general partner of Sovereign Partners, and that's it, right?
 9    A   That's what I believe, yes.
10    Q   Who is the general partner of Southridge Partners
11   2?
12    A   Southridge Advisors.
13    Q   Is Southridge Advisors the general partner of any
14   other funds?
15    A   No.
16    Q   Who is -- South Shore Capital, what is South Shore
17   Capital's structure? Is it a partnership? Is it a --
18    A   It's a foreign corporation.
19    Q   Who controls South Shore Capital? Mr. Hicks?
20    A   Yes.
21    Q   So there's no general partner; there's no managing
22   member?
23    A   No. I believe Steve's title is he's the manager of
24   the sub-adviser.
25    Q   Who is the sub-adviser to South Shore Capital?
```

```
                                                    Page 57
 1    A   I believe it's Southridge Advisors.
 2    Q   Does Southridge Advisors have any association with
 3   any of the other Southridge funds? I'm talking about
 4   Southridge Partners, Southridge Partners 2, Southridge
 5   Capital.
 6    A   It was the general partner of Southridge Market
 7   Neutral.
 8    Q   The Market Neutral Fund no longer exists, right?
 9    A   Correct.
10    Q   Does Southridge Advisers have any association with
11   Dominion Capital?
12    A   No.
13    Q   Who is the adviser at Dominion Capital?
14    A   Southridge Capital Management.
15    Q   Who is the adviser to Dominion Investment?
16    A   Southridge Capital Management.
17    Q   So Southridge Capital Management is the general
18   partner to Sovereign, and is the adviser to the two Dominion
19   funds?
20    A   Correct.
21    Q   Have you heard those referred to as the old funds
22   or the legacy funds?
23    A   Yes.
24    Q   So right now, Southridge Capital Management has no
25   role with respect to the new funds?
```

15 (Pages 54 to 57)

Page 86

1  Q  What are the short-term deals that you understand
2  them to fund?
3  A  There are equity lines, and there are also direct
4  stock purchase plans.
5  Q  Have you had any role in these deals?
6  A  Yes.
7  Q  Could you describe that role?
8  A  Well, it's just part of the overall fund itself in
9  the direct stock purchase plans.
10 Q  Well, have you been involved in ensuring that
11 Southridge has sufficient cash to fund these deals?
12 A  No.
13 Q  What I mean by that is, if they come to you and
14 they said, 'Mr. Saunders, you know, we need so much cash from
15 this particular fund; do we have that money available to use
16 for this deal;' are you involved in conversations like that?
17 A  No.
18 Q  So you're generally just sort of not that involved
19 in these deals; that's what I'm taking from this?
20 A  That's correct.
21 Q  Do you play any role?
22 A  Very little.
23 Q  Can you describe that role?
24 A  The role is just making sure that whatever
25 transactions are taking place, that the accounting is working

Page 87

1  properly for it.
2  Q  What do you have to do to ensure that?
3  A  Just making sure that Cynthia understands what the
4  transaction is. If she has questions on it, I'll help her
5  with that, if I can.
6  Q  What kind of issues have come up in accounting for
7  these transactions?
8     (Interruption.)
9     MR. PISTO: Let's go off the record.
10    (Pause)
11    THE WITNESS: Sorry.
12    MR. PISTO: All right, let's go back on the record.
13 We just took a brief minute break. Mr. Saunders, while we
14 were off the record, we had no conversations about the
15 substance of this matter; is this correct?
16    THE WITNESS: That's correct.
17    BY MR. PISTO:
18 Q  So if you could just describe what sort of issues
19 you have for accounting for these deals? That's all I was
20 just curious about.
21 A  Just making sure that whatever happened on a deal,
22 whatever fund is participating, that it goes into the system
23 properly; those sorts of issues.
24 Q  And you have no role in raising money from any
25 outside investors to fund these deals?

Page 88

1  A  No.
2  Q  Are you aware that that happens?
3  A  Yes.
4  Q  You're aware of that because?
5  A  Because Steve Hicks tells me about it.
6  Q  What does Mr. Hicks tell you?
7  A  You're going to have to be more specific.
8  Q  Does Mr. Hicks tell you, basically, "We've raised
9  some money, and we want you to handle the accounting"? Is
10 that what these conversations are like?
11 A  You know, the general conversation would be, "We're
12 doing Deal X, and there's additional participation by these
13 people."
14 Q  And what does Mr. Hicks expect you to do with that
15 information? I mean, why does he tell you?
16 A  I don't know. Ask him.
17 Q  He doesn't tell you in contemplation of you having
18 some role, you know, with that knowledge; that you're going
19 to go do the books or something?
20 A  No.
21 Q  So it's more like office scuttlebutt really,
22 'here's what the business is doing'?
23 A  You keep -- my role is the accountant. So if he's
24 giving me additional information that helps the accounting be
25 correct, my assumption would be that's what he's doing.

Page 89

1  Q  And does that information help you get the
2  accounting correct?
3  A  Yes.
4  Q  How is that?
5  A  Well, if you don't know what entity is
6  participating in the deal, then the accounting can't be
7  right.
8  Q  Okay. So that's basically why you get the
9  information; just so you -- for the accounting. Okay, thank
10 you.
11    Mr. Saunders, let me hand you what's been
12 previously marked as Exhibit 29. Please take as much time as
13 you need to review this document. Just for the record, this
14 purports to be a letter on Southridge stationery, dated
15 February 23, 2009; addressed to Dear Partner. It's a
16 two-page document, and it's signed Stephen M. Hicks, Chairman
17 and Chief Executive Officer of Southridge LLC.
18 A  Okay.
19 Q  Mr. Saunders, have you seen this document before?
20 A  I don't recall.
21 Q  Are you aware that Southridge sent out a document
22 that states, as this one does on the second page, the first
23 paragraph that -- let me just read, starting with the second
24 sentence of the first paragraph on the second page.
25    "Through the course of our year-end reconciliation

Page 114

1    A   He would go and look in all the bank accounts to
2    see what was there.
3    Q   That information would not be available in the
4    books and records that Southridge was maintaining on a
5    regular basis?
6    A   It probably would be.
7    Q   Where would it be located at?
8    A   All the various entities, on all the different
9    general ledgers that make up those entities.
10    Q   You mean, for example, for each of the funds?
11    A   Correct.
12    Q   But if the cash transactions that are in the
13    general ledger in QuickBooks are not included in the Access
14    database, how would you find out -- well, let me start again.
15    Was there a separate general ledger maintained in QuickBooks
16    for each of the funds?
17    A   Yes.
18    Q   How were transactions allocated amongst the funds?
19    A   I don't know.
20    Q   Who would know?
21    A   Steve.
22    Q   Anybody else?
23    A   No.
24    Q   Did you ever have any discussions with Mr. Hicks
25    about how deals were allocated amongst the funds?

Page 115

1    A   No.
2    Q   Did you have any discussions with anybody else at
3    Southridge about how deals were allocated amongst the funds?
4    A   No.
5    Q   Are you aware of any transactions between the
6    Southridge funds; securities transferred from one fund to
7    another; cash going from one fund to another, that sort of
8    thing?
9    A   Can we step out for a second?
10    MR. KELCOURSE: Sure. Let's go off the record.
11    (A brief recess was taken.)
12    MR. KELCOURSE: Back on the record. During the
13    break, Mr. Saunders, there were no conversations of substance
14    between you and the staff about this matter; is that correct?
15    THE WITNESS: That's correct.
16    MR. JENSEN: Why don't you explain what you just
17    explained to me about the allocation?
18    THE WITNESS: On occasion, there is a transaction,
19    a deal that's done, and there's an allocation that's given to
20    us by Steve. And then sometime after that, he comes back and
21    says, 'Oh, we made a mistake on that; we need to adjust it to
22    this.' So I'm not sure whether that's a -- it's not a trade;
23    it's more a correction in the system. I'm not sure what
24    you'd classify that.
25    MR. JENSEN: When you were out of the room, there

Page 116

1    was testimony about transfers from funds, among the funds to
2    correct a mis-allocation of legal fees?
3    THE WITNESS: Right.
4    MR. JENSEN: That was already testified this
5    morning.
6    THE WITNESS: Yes. Right.
7    BY MR. KELCOURSE:
8    Q   Now in that instance in which there is a
9    misallocation of legal fees, who was responsible for that
10    allocation?
11    A   What do you mean, who is responsible for that
12    allocation?
13    Q   Who directed the allocation in the first instance,
14    the allocation of legal fees?
15    MR. JENSEN: I think it was before his time. But
16    if you know, you can --
17    THE WITNESS: Some of it was before my time.
18    BY MR. KELCOURSE:
19    Q   I take it then that some of it was not?
20    A   Right.
21    Q   So who directed the allocation of the legal
22    expenses?
23    A   Any original allocation of expenses comes from
24    Steve.
25    Q   Now as I understand it, the legal expenses were

Page 117

1    legal expenses incurred by the old funds in connection with
2    litigation involving just the old funds?
3    A   Correct, for the most part.
4    Q   Well, were there part of those legal expenses that
5    should have been allocated to the new funds?
6    A   Yes.
7    Q   For what?
8    A   There were some investors in the old funds that
9    transferred their ownership, their interest into South Shore.
10    So they get part of that allocation.
11    Q   Okay. But other than the investors in the old
12    funds who may have used to a new fund, none of those legal
13    expenses were attributable to expenses of the new funds,
14    correct?
15    A   I can't say a hundred percent, but in general, yes.
16    Q   What I'm trying to understand is how expenses
17    incurred by Sovereign and the two Dominion funds, how does
18    something like that get allocated to the new funds in error?
19    I mean, how can that happen?
20    A   I'm trying to think of the best way to describe it.
21    In essence, those expenses were paid for out of funds,
22    general funds, and were not properly allocated back to the
23    right funds.
24    Q   Who paid the legal bills? Was it coming out of the
25    general fund of Southridge Capital Management, or what?

Page 118

1  A  By and large, everything is paid out of the legal
2  reserve account.
3  Q  And who manages the legal reserve account?
4  A  We manage it.
5  Q  Is there one single legal reserve account for all
6  the funds?
7  A  Yes.
8  Q  Is that account maintained by Southridge Capital
9  Management?
10 A  Yes.
11 Q  And who at Southridge Capital Management is
12 responsible for that account, writing checks, making sure
13 that there's sufficient funds in the account, that sort of
14 thing?
15 A  Jimmy.
16 Q  Does Jimmy Girolamo have authority to write checks
17 on that account on his own?
18 A  No.
19 Q  Who must authorize the checks?
20 A  Steve Hicks.
21 Q  Do you have the authority to authorize checks?
22 A  No.
23 Q  Does anybody else have the authority to authorize
24 checks from that account besides Mr. Hicks?
25 A  I'm not sure.

Page 119

1  Q  Does Henry Sargeant?
2  A  I'm not sure.
3  Q  Can you think of anybody at Southridge who might
4  have authority other than Mr. Sargeant?
5  A  No.
6  Q  And you're not sure even if Mr. Sargeant has the
7  authority?
8  A  I'm not sure.
9  Q  Who -- now I understand that -- we talked about
10 this a little bit earlier -- but the securities, as I
11 understand, the securities were transferred from the old
12 funds to the new funds to compensate for the legal expenses
13 that had been misallocated, right?
14 A  Yes.
15 Q  What was the total amount of legal expenses that
16 were improperly allocated to the new funds?
17 A  I don't recall the exact number.
18 Q  About? Approximately what was it?
19 A  Somewhere around five million.
20 Q  So there were securities transferred from the old
21 fund to the new fund?
22 A  Yes.
23 Q  Was the idea that the securities transferred were
24 worth five million dollars?
25 A  Yes.

Page 120

1  Q  Who made that determination, that the securities
2  being transferred were worth five million dollars?
3  A  Steve Hicks.
4  Q  Did anybody else have anything to do with the
5  valuation of those assets?
6  A  Not to my knowledge.
7  Q  Did you discuss that transfer of securities to
8  compensate for the legal expenses with Southridge's auditors?
9  A  Yes.
10 Q  Who did you talk to?
11 A  Dennis Schall is my best recollection.
12 Q  Describe the discussion you had with Mr. Schall
13 about that transaction?
14 A  I just discussed that we had misallocated expenses,
15 and that we were going to -- that Steve's idea was to
16 transfer the securities to cover that to make everyone whole.
17 Q  What securities were transferred?
18 A  Fonix and Markland.
19 Q  Is this common shares, or what was it?
20 A  Can I correct myself? There may have been some
21 Technest included in that, as well.
22 Q  What kind of securities were transferred?
23 A  I'm not sure exactly, but I believe they were
24 convertible preferred stock for the most part.
25 Q  Any convertible debt?

Page 121

1  A  Possibly.
2  Q  Any common stock?
3  A  I don't recall.
4  Q  Did you have any discussions with Mr. Schall about
5  whether or not the securities that were transferred were
6  actually worth five million dollars?
7  A  No.
8  Q  Did Mr. Schall, or anyone on his team, do any work
9  to check the value of the securities that were transferred?
10 A  Not to my knowledge.
11 Q  Did any of the securities in which the old funds --
12 let me start over again. Did the new funds invest in any of
13 the same type of securities as the old funds?
14 A  Yes.
15 Q  The convertible debt and convertible preferred
16 shares that we've talked about a little bit. Did the new
17 funds invest in convertible debt and convertible preferred
18 shares?
19 A  Yes.
20 Q  Did the new funds invest in convertible debt issued
21 by any of the same issuers as convertible debt that the old
22 funds invested in?
23 A  Yes.
24 Q  How did that come about? Well, let's talk about
25 convertible debt first. Did the old funds ever receive