# EXHIBIT 14

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           )  File No. B-02236-A
SOUTHRIDGE CAPITAL         )
MANAGEMENT, LLC            )

WITNESS:  Henry B. Sargent III
PAGES:    1 through 191
PLACE:    Securities and Exchange Commission
          Boston District Office
          33 Arch Street, Suite 2300
          Boston, Massachusetts
DATE:     Wednesday, April 28, 2010

The above-entitled matter came on for hearing, pursuant to notice, at 9:51 a.m.

RECEIVED
MAY 12 2010
SECURITIES AND EXCHANGE COMMISSION
BOSTON REGIONAL OFFICE

Diversified Reporting Services, Inc.
(202) 467-9200

Page 2

1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4   LAWRENCE PISTO, ESQ.
5   KEVIN KELCOURSE, ESQ.
6   Division of Enforcement
7   Securities and Exchange Commission
8   33 Arch Street, Suite 2300
9   Boston, Massachusetts 02108
10
11 On behalf of the Witness:
12  JOSHUA L. DRATEL, ESQ.
13  2 Wall Street, Third Floor
14  New York, New York 10005
15  (212) 732-0707

Page 3

CONTENTS

WITNESS                              EXAMINATION
Henry B. Sargent III                     4

EXHIBITS:   DESCRIPTION                IDENTIFIED
81   Subpoena & attachments                9
82   Letter dated 1/8/08                  51
83   Letter dated 11/25/02                53
84   Email dated 1/30/03                  53
85   LecStar Preliminary Evaluation       55
86   Appraisal Valuation Report           60

Page 4

PROCEEDINGS

MR. PISTO: We are on the record at 9:51 on Wednesday, April 28, 2010, at the offices of the United States Securities and Exchange Commission, Boston, Massachusetts.

Mr. Sargent, my name is Lawrence Pisto, and with me is Kevin Kelcourse. We are both members of the staff of the Division of Enforcement of the SEC. We have been designated as officers of the Commission for purposes of this proceeding.

Mr. Sargent, please raise your right hand. Whereupon,

HENRY B. SARGENT III

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PISTO:

Q  Would you please state and spell your full name for the record?

A  Yes. Henry Barry Sargent III. So it's H-e-n-r-y, B-a-r-r-y, S-a-r-g-e-n-t.

Q  Thank you, Mr. Sargent. Would you please give us your home address and Social Security number?

A  It's 381 West Mountain Road, Ridgefield, Connecticut.

Page 5

Q  And your Social Security number?
A  [redacted]
Q  Thank you. And your birth date?
A  [redacted]

MR. PISTO: Mr. Sargent, this is an investigation by the United States Securities and Exchange Commission in the matter of Southridge Capital Management, B-02236, to determine whether there have been violations of certain provisions of the federal securities laws. However, the facts developed in this inquiry might constitute violations of other federal or state civil or criminal laws.

Mr. Sargent, prior to the opening of the record, you were provided with a copy of the Formal Order of Investigation in this matter. It will be available for your examination during the course of this proceeding. Mr. Sargent, have you had an opportunity to review the Formal Order?

THE WITNESS: Yes.

MR. PISTO: Thank you. Also prior to the opening of this record, you were provided with a copy of the Commission's Supplemental Information Form 1662. A copy has previously been marked as Commission Exhibit Number 1 in this matter. Also, a copy of this form is attached to the subpoena that we sent you.

Mr. Sargent, have you had an opportunity to review

Page 14

1  Q  Okay, we'll get back to LecStar in a second. Mr.
2  Sargent, have you ever been indicted, convicted or pled
3  guilty to any offense?
4  A  No.
5  Q  Mr. Sargent, could you briefly describe your
6  educational background?
7  A  Yeah. I have a BA from Connecticut College;
8  graduated in 1989. I have a JD from Fordham University;
9  graduated in 1995. I also have a designation which is
10 Chartered Financial Analyst designation, CFA.
11 Q  So you graduated from Fordham in 1995. Did you
12 take the bar?
13 A  Yes.
14 Q  Are you a member of the bar of any state?
15 A  In New York.
16 Q  I assume you keep that current?
17 A  Yes.
18 Q  After you left Fordham, could you just briefly
19 describe your professional background?
20 A  Yeah. I worked for roughly three years for a small
21 transactional law firm in New York by the name of Claugus &
22 Mitchell; then took employment from Southridge Capital in the
23 fall of 1998.
24 Q  How did you get a job at Southridge Capital?
25 A  I think I -- well, I answered a posting in one of

Page 15

1  the work bulletin boards that was through the New York
2  Society of Security Analysts, the NYSSA. I know that the
3  partners at the time at Southridge, one of them had a contact
4  there or had a connection, or may have been a member. And
5  so, they put the postings up. And so, I answered that
6  particular posting.
7  Q  Why did you decide to leave the practice of law?
8  A  I was interested in opportunities in the investment
9  community, and I had some, as I said, some transactional
10 experience with clients in my days practicing law. And I
11 thought that would be interesting as a career opportunity.
12 So for that reason, I was -- I joined the NYSSA, and tried to
13 get some exposure to opportunities in that field.
14      BY MR. KELCOURSE:
15 Q  What was the posting for?
16 A  I think it was -- I don't remember. But I think
17 was something like a junior analyst or something that was --
18 I would call it a junior analyst.
19 Q  So it was not a posting for an in-house counsel?
20 A  It was not an in-house legal counsel job, no.
21      BY MR. PISTO:
22 Q  Who did you first have contact with at Southridge?
23 A  I spoke with -- I don't know the time frame, but I
24 spoke with Dan Pickett, Daniel Pickett, who at the time was
25 of the principals of, or partners of Southridge Capital.

Page 16

1  Q  And who else did you talk with at Southridge?
2  A  Well, the initial contact, one or two, or possibly
3  three times was Dan. And eventually, I met Steve Hicks
4  sometime, I want to say in the spring of 1998, maybe summer
5  of '98, something like that.
6  Q  Who is Mr. Hicks?
7  A  Mr. Hicks is one of the principals, one of the
8  managers of Southridge Capital. He was the founder of it.
9  Q  And eventually, in this time period in 1998, you
10 went to work for Southridge?
11 A  Correct.
12 Q  Why did you decide to take the offer from
13 Southridge?
14 A  As I say, it was an opportunity that I was looking
15 for. It was -- at the time, to me, it seemed like an
16 attractive offer. And it was a way, I guess, for me to, you
17 know, to -- training as a lawyer, it's not impossible, but
18 yet it's not -- it's a little more difficult than, say if you
19 get an MBA degree to go directly into Finance. And so, I
20 wanted -- you know, I knew I had to get in at a certain
21 level. And I was at the age where that made sense to do it.
22 And so, that to me at the time was an attractive offer for a
23 career choice.
24 Q  What position were you hired for?
25 A  As I say, I think it was probably junior analyst.

Page 17

1  Q  How did your role develop over the -- since you
2  were hired initially at Southridge?
3  A  Well, it's developed over time. You know, with my
4  legal background, you know, I was able to, you know, spend
5  time on deal formation. And initially, I was looking at
6  companies and, you know, reviewing documents, and dealing a
7  bit with the regulations surrounding the particular
8  investments that we look at, and that Southridge was making
9  at the time. And over time, that role has changed, and
10 responsibilities have increased. And my role as, you know,
11 legal advisor came more to the forefront.
12      And it changed further when Dan Pickett left, which
13 was in early 2003, I believe, or early 2004. As I say, I was
14 probably the second employee other than Dan Pickett at the
15 time; Dan Pickett and Stephen Hicks. And that grew to be,
16 you know, ten or eleven employees with respect to the funds.
17 And so, that has evolved over time to increased
18 responsibilities kind of operationally, in terms of Human
19 Resources a bit, as well as legal, as well as, you know,
20 consulting on business matters.
21 Q  How would you describe your role now at Southridge?
22 A  I would say that I'm consulted, and I am involved
23 in virtually every aspect of the business in one way, shape
24 or form. So, you know, so to the extent that -- you know, as
25 I say, Southridge has hired people after, subsequent to my

### Page 18

1  hiring because I was -- you know, I had been there
2  previously, and had kind of a senior role. You know, I got
3  involved in being able to help, to help manage new staff.
4  And as I say, my role was changed once Dan Pickett left, as
5  well, you know. And I've been -- I would say I'd probably
6  describe myself as the Number two person there.
7      Q  I was actually going to ask you, would it be fair
8  to describe yourself as the Number two person?
9      A  Well, I mean, outside of Stephen, at this point, I
10 would be the one who has the most longevity at the firm.
11         BY MR. KELCOURSE:
12     Q  Other than Mr. Hicks, are you the one with the most
13 authority at the firm?
14     A  I would say, yes.
15         BY MR. PISTO:
16     Q  Do you have any ownership interest in the firm?
17     A  I do now.
18     Q  What is that?
19     A  Through a kind of what I'll call an LLC, which is
20 kind of -- which holds membership interest of the advisers, I
21 own 25 percent of that LLC, that kind of holding company LLC.
22         BY MR. KELCOURSE:
23     Q  What's the name of the LLC?
24     A  It's just called Southridge LLC. And that was
25 effective as of the beginning of this year.

### Page 19

1          BY MR. PISTO:
2      Q  Actually, let me ask you a question. Has
3  Southridge changed the structure of the company in the last
4  year, because I know initially, it was Southridge Capital
5  which was the adviser. Has there been any change in the past
6  year?
7      A  Well, apart from -- I mean, this is -- a couple
8  reasons for doing this. But one was the estate planning
9  issues in the Hicks family. Another was my involvement as an
10 equity owner. Southridge Capital had been the advisor to
11 several of the -- or shall we say all of the funds, the
12 active funds. And Southridge Advisors was created in
13 2007-2008 to establish the, shall we say the successor to the
14 funds, what I'll call the open funds, the funds that were
15 open to new investment, as opposed to the funds that were no
16 longer open to new investments.
17         So there are, again, two private advisory managers;
18 one, Southridge Capital, the other, Southridge Advisors.
19 Southridge Advisors is the general partner to the, what I'll
20 call the open funds, the funds that are open to new
21 investments, and that is Southridge Partners, Southridge
22 Partners 2. It acts as the general partner to those two
23 entities, and it acts as the investment advisor to South
24 Shore Capital, which is the offshore version of the funds.
25         Southridge Capital on the other side is, it remains

### Page 20

1  the general partner for -- to Sovereign Partners and to
2  Dominion Capital and Dominion LLC -- or Dominion Investment
3  LLC.
4      Q  Okay, thank you. Again, what exactly was the
5  reason for splitting up? You mentioned some estate issues.
6  And I'm not sure exactly what advantage do you have from
7  doing this?
8      A  Well, the closed funds, you know, are -- the closed
9  funds haven't taken new money for a period of time. They're
10 in the process really of winding down. Southridge Advisors
11 was created to -- as a successor entity to the new funds, you
12 know, with the idea that that would be the advisor going
13 forward for any new business that would be -- you know, any
14 fund advisory business, unregistered fund advisory business.
15     Q  For instance, of winding down Southridge Capital?
16     A  Well, Southridge Capital, you know, Southridge
17 Capital still exists. It's still active. But with respect
18 to the old funds, once the old funds have been, you know,
19 have been wound down, liquidated, then Southridge Capital
20 will probably remain dormant.
21         BY MR. KELCOURSE:
22     Q  When you referred earlier to Southridge Capital
23 Management as the advisor of the active funds, what did you
24 mean by active funds?
25     A  Well, I'm making the distinction between active

### Page 21

1  versus closed. I really should mean open versus closed. So,
2  as I say, Sovereign, Dominion Capital, Dominion Investment,
3  they have been closed to new investment for a period of time.
4  But Southridge Partners, Southridge Partners 2, those are
5  open to outside investors. So Advisors acts as the advisor
6  to those entities. So I guess I mis-spoke if I said active
7  versus passive. I don't mean that. I mean open to new
8  investments versus closed to new investments.
9      Q  But in talking about Southridge Capital, though,
10 you referred to it as being the advisor of the active funds.
11 I'm trying to understand what you meant by that?
12         MR. DRATEL: He said it was a mistake.
13         MR. KELCOURSE: But Southridge Capital is not the
14 advisor to the open funds, right?
15         THE WITNESS: Southridge Capital traditionally was
16 the advisor to Sovereign, Dominion Capital, Dominion
17 Investment, and I think at one point, Southridge Partners.
18         BY MR. KELCOURSE:
19     Q  South Shore Capital, as well?
20     A  And South Shore Capital. So there were five funds,
21 three offshore, two on shore, for which it served as either
22 advisor, sub-advisor or general partner. So as I say, three
23 of those funds are -- I mis-spoke when I said active -- are
24 no longer, and have not accepted new investments for a period
25 of time. So those are what I'll say closed and are in the

Page 86

1  A   Bank account.
2  Q   Did you have to sell, liquidate any assets in order
3  to get the cash to make the contribution?
4  A   Not that I recall, no.
5      BY MR. PISTO:
6  Q   Mr. Sargent, I just wanted to ask you generally,
7  how has Southridge been -- how does Southridge pay its legal
8  bills?
9  A   Pay its legal bills?
10 Q   Yes. Does Southridge pay them, or do the funds pay
11 them?
12 A   Well, the answer is, it depends. Most of the time,
13 their legal bills are fund-related legal bills. So for
14 example, their positions in portfolios that require outside
15 legal counsel. They submit bills; they get paid, not quite
16 but not -- sometimes once a month, sometimes once a quarter.
17 But primarily, they're paid by the funds because they're
18 fund-related. The bills are associated with fund-related
19 activity.
20 Q   Have there been any issues of misallocation between
21 the funds for paying legal fees?
22 A   About a year and a half ago, something like that,
23 we found out -- it was discovered by our finance officer
24 there was a misallocation between some funds, between funds
25 with respect to some legal bills.

Page 87

1  Q   Who is the finance officer who discovered that?
2  A   Tom Saunders.
3  Q   And what specifically, to the best of your
4  recollection, occurred?
5  A   I don't -- I have a -- I don't -- My best
6  recollection is that certain funds had paid for the expenses,
7  legal expenses of other funds, and the expenses were
8  misallocated between one fund and another.
9  Q   Were these old funds paying for new funds, or new
10 funds paying for old funds?
11 A   My recollection is that it was old -- it was costs
12 associated with some of these older litigations that were old
13 fund investments, and they were misallocated to -- as
14 expenses to new funds.
15 Q   Do you know why this misallocation occurred?
16 A   No, I don't. I know -- I mean, you know, I didn't
17 know about it until it was presented to me in the process of
18 discovery by Tom. So I can't speculate as to why it
19 happened.
20 Q   Do you know, would there have been sufficient
21 liquidity in the old funds to cover the bills if the
22 misallocation hadn't occurred?
23 A   The answer is I don't know about that. I would
24 suspect there would be liquidity in the fund, in the old
25 funds. But having said that, my recollection is, is this was

Page 88

1  an allocation that was done prior to Mr. Saunders' arrival.
2  So it was someone else. It was the fund accountant whose job
3  he took over. So it was during a period of time of
4  2004-2005-2006, in that time frame. Again, this is from
5  30,000-foot view level because I don't know the details.
6  Q   Well, let me ask you anyway, what happens when a
7  fund doesn't have sufficient liquidity to cover legal bills?
8  I mean, how are they paid if the fund can't sell enough
9  securities to cover them?
10 A   Well, again, you know, to the extent that I can
11 recollect, you know, those bills get pushed off, and they
12 don't get paid until such time as there is liquidity.
13 Q   Does the general partner have any liability for
14 those bills?
15 A   The general partner is typically indemnified by the
16 funds with respect to that. So to the extent that the
17 general partner engages a law firm for purposes of doing
18 whatever that is, and it's a fund-related expense -- so for
19 example, it's something, some issue with respect to, or
20 litigation associated with a particular investment -- the
21 general partner typically is indemnified by the funds with
22 respect to that type of obligation that gets incurred.
23 Q   So the bills just basically -- I think you're
24 saying the bills just stay there to the funds if the funds
25 can't cover them?

Page 89

1  A   To the extent that -- Look, again, you know, I'm
2  not -- To my knowledge, and I'm not the person who does this,
3  but, you know, bills get paid at the time that there are
4  sufficient liquidity to pay them. Lawyers get very unhappy,
5  but that's unfortunately the case.
6  Q   Let me go back to the specific question of
7  misallocation. How were the older funds -- I'm sorry, how
8  were the newer funds repaid for the misallocation?
9  A   I don't know the details. But from what I
10 recollect, there were certain assets on the books,
11 investments or participation in investments in the portfolio
12 that were transferred over to the new funds.
13 Q   Do you know what those investments were?
14 A   Off the top of my head, I think certain of the
15 interest in Technest; certain of the interest I think maybe
16 in Ackers; certain interests in Fonix. There may be others.
17 Q   How were those interests that were transferred
18 valued?
19 A   Again, I --
20     MR. DRATEL: Do you want to chat about it?
21     THE WITNESS: Well, no. I'm just trying to think.
22 I don't want to assume. Well, yes, can we go off the record?
23     MR. PISTO: Yes. Let's go off the record.
24     (A brief recess was taken.)
25     MR. PISTO: Let's go back on the record at 1:34 --

### Page 94

1  it could have bled into 2004. But again, I don't know the
2  specifics of that.
3      Q   What I'm trying to understand is whether or not
4  this was sort of an isolated problem with allocations a
5  couple of months, or it was a problem over a period of time.
6  And what is your understanding in that regard?
7      A   My understanding is that, to the extent that --
8  that there may have been more than one misallocation. But it
9  wasn't a pattern, but it may have been isolated. But in
10 order to try to take full breadth of that, he looked back in
11 time just to make sure he captured whatever he thought might
12 be associated with this issue.
13     Q   In the process of evaluating the -- well, let me
14 step back. How much money from the new funds was used to pay
15 the bills of the old funds?
16     A   My recollection is in the neighborhood of two or
17 three million dollars.
18     Q   It wasn't about five and a half million dollars?
19     A   That I don't know. I mean, I'm not saying it's
20 not. I just don't -- I don't know the specifics.
21     Q   Why do you think it's in the neighborhood of three
22 to four million?
23     A   Just my recollection.
24     Q   Who told you that?
25     A   Well, again, I think it was -- you know, it's my

### Page 95

1  recollection based on conversations I've had with
2  individuals, and I have no specific recollection of any
3  particular conversation with anyone.
4      Q   When were the new funds -- when were the assets
5  transferred to the new funds to compensate for the use of the
6  money for old funds' legal bills?
7      A   Sometime in 2008.
8      Q   Was the amount -- so the value of the assets
9  provided to the new funds, was that equal to the amount of
10 the legal bills that were paid?
11     A   Again, I believe the answer is yes.
12     Q   So there was no interest paid, or anything like
13 that?
14     A   I don't remember if there was interest paid or not.
15 I mean, it -- Again, I mean, you know -- No, I don't know. I
16 can't recall.
17     Q   Who would know the answer to that question?
18     A   Well, at Southridge?
19     Q   Yes.
20     A   Either Tom, Tom Saunders or Stephen Hicks.
21     Q   Is there somebody outside of Southridge who would
22 know the answer to that question?
23     A   Well, I would suspect that counsel, and I would
24 expect auditors would know.
25     Q   Who was the counsel at Southridge in connection

### Page 96

1  with this issue?
2      A   Gersi & Savage.
3      Q   Just one question before we leave that. Payment of
4  legal expenses, who authorizes the payment of legal expenses?
5      A   Stephen Hicks.
6      Q   And who would he direct to pay the legal expenses?
7      A   He would direct -- well, he would direct either Tom
8  Saunders or the, what I'll call the kind of staff accountant
9  by the name of, his name is James Girolamo. He deals with,
10 he's kind of the cash management person.
11     Q   And would Mr. Hicks direct Mr. Girolamo as to which
12 account to pay the expenses out of?
13     A   Well, to the extent that there was a question with
14 respect to what account, I would imagine that, yes, he would
15 make that determination.
16 BY MR. PISTO:
17     Q   Mr. Sargent, generally, how are you involved in the
18 process of valuing securities?
19     A   Well, you know, I'm -- To the extent that valuation
20 is discussed, you know, I can get consulted on a number of
21 different ways. So I'm, you know, I'm not -- you know, I'm
22 not the determinative or the sole voice with respect to that.
23 But I do get consulted on occasion if there's a particular
24 valuation issue that needs to be discussed.
25     Q   Well, what kind of issues would be drawn to your

### Page 97

1  attention?
2      A   Well, you know, anything that could be -- well,
3  something other than what I'll call plain vanilla. So, you
4  know, if there's a particular security or securities that,
5  you know, that have a, you know, that have a particular
6  event that happened in a corporation, in which case, the
7  question becomes what, you know, what if anything, you know,
8  would we want to do with respect to the valuation; you know,
9  if there's any particular -- that would be primarily what
10 goes on. In the course of monitoring the portfolio, if
11 there's any new news with respect to certain activities that
12 are involved, that's when we would have, you know, we would
13 have discussions regarding, you know, valuation of the
14 security.
15     Q   Who was primarily responsible for valuing
16 securities at Southridge in the Southridge funds?
17     A   In the Southridge funds, it's Steve.
18     Q   Do you generally work with him to value the
19 securities, or are you called in on more specific occasions?
20     A   Let me give you a hypothetical example. If we buy
21 a million dollars worth of preferred stock, and it has a
22 particular dividend, cumulative dividend of -- pick a
23 number -- five percent at the time that it's, you know, put
24 on the books, at the time of the investment, you know, it's
25 put on the books at a million dollars; you know, it's put on